# CHARLES A. WILSON, Respondent, v. TORCHON LACE & MERCANTILE COMPANY, Appellant.

St. Louis Court of Appeals, July 19, 1912.    Motion for Rehearing Overruled October 15, 1912.

1. CORPORATIONS: Agreement to Repurchase Stock: Equity: Pleading. An action to compel a corporation to repurchase stock sold by it to plaintiff, in accordance with an agreement made at the time of sale, in which the petition prays for a rescission of the contract of sale and a cancellation of the stock certificates and judgment for the purchase price, is *held* to be an action in equity.

2. ————: Ultra Vires Contracts: Enforcement. A person parting with his money in reliance on a promise by a corporation, which, under the law it has no power to make, cannot compel fulfillment, especially where the contract remains executory.

3. ————: ————: Agreement to Repurchase Stock. An agreement by a manufacturing corporation, on a sale of stock of the original issue, and not treasury stock—i. e., stock which, having been paid for and issued, is subsequently turned back to the company to be disposed of for corporate purposes—to repurchase such stock at any time the purchaser desired to sell, violates Sec. 1327, R. S. 1899 (Sec. 3354, R. S. 1909), providing the mode by which the capital stock of such corporations may be decreased, and is *ultra vires* and void.

4. ————: ————: ————. An *ultra vires* agreement by a corporation to repurchase stock sold by it cannot be upheld on the ground that it is an executed contract, since, as to the corporation, it is wholly executory.

5. ————: ————: Availability as a Defense. Where a transaction is one which is not permitted, or which is forbidden, by law, and is not merely in excess of, but contrary to, the charter powers of a corporation, a plea of *ultra vires* is available to the corporation.

6. MONEY HAD AND RECEIVED: Nature of Action. The action for money had and received engrafts, to a certain extent, equitable principles upon an action at law, but it cannot be used to evade the application of settled equitable principles.

7. CORPORATIONS: Agreement to Repurchase Stock: Equity: "Clean Hands." A plaintiff, seeking to enforce a contract by

167 Mo. App.—20

a corporation to repurchase stock sold to him by it, who has received cash and stock dividends, which he does not offer and is not able to return, does not come into court with clean hands.

8. ———: ———: Conditional Sale. A purchase of stock from a corporation, upon the corporation's agreement to repurchase at any time the purchaser wished to sell, was not a conditional one, where the purchaser was so completely the owner of the stock that he received, appropriated and held the cash and stock dividends thereon.

9. ———: Ultra Vires: Availability as a Defense. The plea of *ultra vires* is available to a corporation for the benefit of its stockholders, to defeat a recovery on a contract made by it, although the stockholders themselves do not intervene and set up such defense.

NORTONI, J., dissents.

Appeal from St. Louis City Circuit Court.—*Hon. Daniel D. Fisher,* Judge.

REVERSED.

*John C. Robertson* for appellant.

(1) The capital stock of a corporation is a trust fund charged with the payment of debts, and must be treated as such. The contract alleged in the petition is unlawful, *ultra vires.* It is contrary to public policy for a corporation to buy and sell its own stock. Brice on Ultra Vires, p. 94; Am. & Eng. Ency. Law, p. 703; Trans. Co. v. Kavanaugh, 93 Ala. 324; Mining Co. v. Milling Co., 62 Fed. 362; Thompson on Corp., Secs. 2054, 3701; Trevor v. Whitworth, 12 App. Cases 409; Bank v. Wulfskuhler, 19 Kan. 60; Crandall v. Lincoln, 52 Conn. 73; Coppin v. Greenless, 38 Ohio St. 275; Woodworth v. Railroad, 17 Barb. 397; Gill v. Ballis, 72 Mo. 424, 435; Rawhide Co. v. Hill, 72 Mo. App. 148; Banking Co. v. Manufacturing Co., 168 Mo. 645; Insurance Co. v. Floyd, 74 Mo. 291; Van Cleve v. Berkey, 143 Mo. 109; Shields v. Hobart, 172 Mo. 518; Boley v. Development Co., 126 Mo. App. 116; Adams & Westlake Co. v. Deyetts, 49 Am. St. Rep. 887; Clapp v. Patterson, 104 Ill. 26. (2) This defendant is a

Missouri corporation, and its powers to contract must be found in the laws of the State, which gave it existence, Sec. 3346, R. S. of Missouri is the section from which it directly derives its powers. It cannot exceed its charter powers. Dairy Co. v. Mooney, 41 Mo. App. 665; Crandall v. Lincoln, 52 Conn. 73; Coppin v. Greenless, 38 Ohio St. 275. (3) The statutes of Missouri provide the manner in which the capital stock of a corporation can be reduced, and can legally be done no other way. R. S. of Missouri, Secs. 2981, 2982, 2990; Coppin v. Greenless, 38 Ohio St. 275.

*Edward A. Feehan* for respondent.

(1) The transaction described in plaintiff's petition, and shown by the evidence, constitutes a conditional sale of treasury stock of a private corporation, with the option in the purchaser to return the stock and receive back the purchase price. It does not amount to a buying of its own stock by the corporation, and is not *ultra vires*. Consol. Co. v. Brynteson, 143 Fed. 829; Mulford v. Torrey Co., 100 Pac. (Colo.) 596; Boynton v. Woodbury, 101 Mass. 346; Adam v. Investment Co., 80 Atl. (R. I.) 426; Vent v. Duluth Co., 64 Minn. 307; Hunter v. Des Moines, 123 N. W. 213. (2) Where a corporation receives money under a contract which it alleges to be *ultra vires,* and which it refuses to carry out, it may be sued for money had and received. Insurance Co. v. Nelson, 92 N. E. (Ind.) 2; Morville v. Tract Society, 123 Mass. 129; York v. Bank, 105 Mo. App. 127; Clifford Co. v. Donovan Co., 195 Mo. 262. (3) While a corporation may not employ its means for purposes other than the legitimate objects of its creation, yet the defense of *ultra vires* is not open to it where the contract is merely in excess of its power and not prohibited by the charter, especially where such contract has been fully performed by the other party. Smith v. Richardson, 77 Mo. App. 422; Che-

noweth v. Express Co., 93 Mo. App. 185; Williams v. Verity, 98 Mo. App. 654; Adams v. Insurance Co., 115 Mo. App. 21; Osmer v. LeMay, 155 Mo. App. 211; Bank v. Trust Co., 187 Mo. 494; Cass County v. Insurance Co., 188 Mo. 1; Eastern Ass'n v. Williamson, 189 U. S. 122. (4) A subscription to stock, procured by fraud and misrepresentation, may be rescinded. Ramsey v. Thompson Co., 116 Mo. 313; Cawthra v. Stewart, 109 N. Y. Supp. 770; Trollinger v. Amarillo Co., 103 S. W. 199; Mulholland v. Match Co., 77 Pac. 497. (5) A corporation is responsible for the wrongs it commits, and will not be heard to deny, or allowed to evade, its liability on the ground that those wrongs resulted from the exercise of powers not granted by the law of its organization. Alexander v. Relfe, 74 Mo. 495; Williamson v. Association, 54 S. C. 582; Railroad v. Quigley, 21 How. 202.

REYNOLDS, P. J.—Plaintiff in this case, respondent here, originally brought his action against the Torchon Lace & Mercantile Company, a manufacturing corporation organized and operating under the general statutes of this State as a manufacturing and business corporation, and against Sylvester G. Lewis, president and manager of that company, to recover $1250 and interest, plaintiff claiming that in July, 1908, the defendant company, acting through its president, had solicited and induced plaintiff to purchase 100 shares of the stock of the defendant corporation for the sum of $1250, and that for the purpose of inducing plaintiff to purchase the stock Lewis, as the president and general manager and with the knowledge and authority of the defendant corporation and its directors, "and for the purpose of deceiving, misleading and cheating plaintiff, falsely and fraudulently represented to plaintiff that said stock was reasonably worth the said sum of $1250 and was convertible at the option of plaintiff at any time

for said purchase price and that said corporation had made ample provision to retake said shares of stock from plaintiff, and refund to plaintiff the purchase price of $1250 therefor, at any time after said purchase that plaintiff should so desire.'' That as a further inducement to plaintiff prior to the purchase and as evidence of the pretended good faith of the corporation, Lewis exhibited and delivered to plaintiff a printed circular issued by authority and direction of the corporation, announcing to plaintiff and to the public generally as an inducement to obtain purchasers for the stock of the corporation, that each and every purchaser of the stock could at any time thereafter obtain from the corporation upon demand an immediate return of all the purchase money paid therefor less a nominal fee for transfer, setting forth in the printed circular ''the pretended absolute security and safety and superior advantages thereby obtained by investments in said stock by reason of the ability of the purchaser to immediately procure, at his option, a return of the purchase money therefor.'' It is charged that all of the announcements and representations contained in the circular were false and fraudulent at the time they were made to plaintiff; that these false and fraudulent representations were made to plaintiff by Lewis acting with the corporation in a fraudulent conspiracy to cheat and defraud plaintiff and to obtain from plaintiff the $1250 on the false and fraudulent pretenses and representations aforesaid; that on or about the 2nd of July, 1908, plaintiff, placing implicit faith and confidence in defendants and relying upon their statements and assurances and believing all said false and fraudulent representations to be true and having no means to ascertain or reason to believe to the contrary and upon the express condition thereof, was influenced and induced thereby to purchase and did purchase the stock and paid the sum of $1250 therefor to the defendant corporation. which

sum was duly received by the corporation, and the certificates of stock received by plaintiff; that on or about the 1st of April, 1909, "pursuant to said representations and conditions of sale of said stock, as aforesaid, and still believing said false and fraudulent representations as aforesaid to be true, plaintiff duly tendered said certificates of stock to defendant corporation, and demanded in return therefor, the $1250, less the cost of transfer thereof, pursuant to the terms and conditions of the sale and purchase thereof by plaintiff, as aforesaid, but that the corporation then and there refused and still refuses to accept said certificates of stock or to refund the purchase price thereof or any part thereof whereupon plaintiff notified said defendant that said contract of sale by virtue of the promises herein was rescinded and annulled." Plaintiff accordingly prayed the court to find the contract of purchase and sale duly and lawfully rescinded and annulled by virtue of the premises, that plaintiff be permitted to deliver in court the certificates of stock so refused by defendant corporation and that judgment be rendered against defendant for the sum of $1250 and interest thereon and for any other and further relief to which plaintiff may be entitled. Lewis filed a general denial by way of answer.

The answer of the defendant corporation, admitting the incorporation of the company, is a specific denial of all the other averments. As affirmative defense the answer sets out that, unsolicited by defendant or any of its officers, plaintiff came to the place of business of defendant and purchased fifty shares of the stock, paying $625; that certificates were duly issued and delivered to him and afterwards on the 30th of January, 1909, all of the original stock not having been sold, a stock dividend of 33 1-3 per cent was declared by the board of directors of the corporation defendant and that as a stockholder at the time

plaintiff became entitled to 16 2-3 shares of the un-
issued stock; that a certificate for said 16 2-3 shares
was duly issued and delivered to plaintiff, who after-
wards, on the 21st of September, 1909, for value sold
this dividend stock to one Vaughn, who, presenting
the original certificate to the defendant company, had
it taken up and exchanged for one which was issued
to him in his own name in lieu of the one for 16 2-3
shares dividend stock theretofore issued to plaintiff.
It is further averred that on the 15th of February,
1909, a cash dividend of twelve per cent was duly
declared by the board of directors of the defendant
corporation on its capital stock and plaintiff as a
stockholder received and retained the sum of sixty
dollars, the dividend on the fifty shares of stock in
his name.   These matters are alleged as estoppel
against plaintiff from asking to have the alleged con-
tract rescinded, it being averred that plaintiff in
seeking equity is not himself offering to do equity.
As a further defense it is set out that the corporation
being organized under Ch. 12, Art. 9, of the statutes
of Missouri, 1899, and its powers derived therefrom,
that the contract alleged in the petition is *ultra vires*
the corporation and is void because contrary to and
against sound public policy and that it is beyond the
power of the corporation to deal in its own stock in
the manner set out in the petition; that its capital
stock is a trust fund for its creditors and that if per-
mitted to traffic in its own capital stock it would
destroy the capital that its creditors have a right to
rely upon.

To this answer a general denial was interposed
by way of a reply.

The cause seems to have been treated as one at
law.   A jury was waived and a trial had before the
court.   At the close of plaintiff's testimony plaintiff
dismissed as to the defendant Lewis and at the conclu-

sion of the evidence in the cause the court found for plaintiff and against the defendant corporation in the sum of $1314.58, the amount sued for together with interest. Motions for new trial and in arrest were duly interposed, overruled, exceptions saved and appeal perfected to this court.

It developed at the trial that plaintiff had taken fifty shares of the stock in his own name and caused fifty shares thereof to be issued in the name of his wife, but that plaintiff had paid the purchase price, $1250, for the 100 shares, and now appears as holder of all of the 100 shares, the certificate for fifty shares issued in the name of the wife being indorsed in blank by her and in possession of plaintiff. The cause proceeded upon the assumption that plaintiff is owner of all of the 100 shares. It was also admitted that the stock dividend of 33 1-3 per cent which had been declared was paid by the issue of 16 2-3 shares of unissued stock of the company in the name of plaintiff and a like number in the name of his wife, both of whom had sold and transferred these 33 1-3 shares of stock to one Vaughn and that plaintiff and his wife had received a cash dividend of $120 upon these 100 shares since their purchase.

Plaintiff testified that Lewis, president and manager of the company, had called on him and told him that he had a little stock he desired to sell in the company; that nearly all of the stock of the company was sold but he had a little he would like to sell because he wanted to put in some supplies in the company which were needed to work up its business. Plaintiff told him he had no money to pay for stock unless he could get possession of the money he put in at any time he wanted it; that he expected to use his money to buy a farm. Lewis told him he could fix that; that he could fix it all right whenever plaintiff found a farm that he wanted to buy. Plaintiff testified that Lewis did not give him very good satisfaction at the

time of this visit but that he came to him again and
repeated the same story but still gave him no assur-
ance that he could have his money back when he
wanted it.   He told Lewis that he had his money in-
vested in Jefferson Hotel bonds yielding him a certain
interest and on the condition that he could have it
when he wanted it.   Lewis said, "Well, I can fix that
very well with you.   .   .   .   We have made arrange-
ments that 10 per cent of all the stock we sell is put
in the bank for that purpose, and you can readily have
your money by presenting the stock any time you want
and it will pay you better for you to draw 8 per cent
on that than to draw it out, but you can draw it out
though whenever you want to buy your farm." Plain-
tiff   at   the   invitation   of   Lewis   went   down   to
the place of business of the corporation to examine it:
He testified that he did not like the looks of things
very well; that he let the matter drop for several days
when Lewis called on him again and plaintiff told
him that if he was not satisfied that he could get his
money back when he wanted; that he wanted his
money where he could put his hands on it at any time.
Lewis said, "All right, we have got matters fixed so
you can have it at any time.   We have $30,000 in the
bank for that purpose," and he mentioned two or
three cases where he said he had paid money back to
the parties.   The matter ran along this way for three
or four weeks before plaintiff made up his mind to
take the stock.   He then went to Lewis and said to
him, "If you can assure me that I can have the money
back when I want it, I will take 100 shares."   Lewis
gave him the price on 100 shares at $12.50 and told
him that the stock would be worth $16 instead of that
figure in six months, and said it was better than the
Jefferson Hotel bonds because it would give him more
and he could have more privileges than the Jefferson
Hotel bonds gave him.   Plaintiff accordingly con-
cluded to take 100 shares on these conditions.   He tes-

tified that before this conclusion was reached, Lewis gave him a paper guaranteeing this and that the guarantee was contained in the paper, and also made special to him verbally by Lewis. The paper referred to was a printed circular and was put in evidence by defendant company. This paper is headed, ''Your Money Back When You Want It.'' It then, in substance, sets out that objection has often been made to the purchase of unlisted stock which may be undoubtedly a good investment and would pay greater dividends than listed stocks but if the holder wanted to sell, the stock being unlisted, he could not do so without sacrificing it and losing money. The circular states that this is the only objection which can be offered to buying good unlisted securities and that in order to overcome this objection and make the stock of the Torchon Lace & Mercantile Company the very best investment in St. Louis, plans had been completed by the directors ''for buying, selling and loaning money upon this stock, so that any stockholders in the company, who through necessity, or for other reasons, desire to dispose of their stock, or borrow money upon it, can do so. As soon as the stock is all sold, a sum of money equal to 10 per cent of the capital stock of the company will be placed in bank to be used for this purpose, and when stockholders wish to sell their stock, all they need to do is to notify the secretary of the company, who will immediately pay them the full market value for it less only a small fee of 2 per cent to cover the actual cost of selling same, as hereafter explained.'' The circular then goes on to state that as soon as the stock has been received by the secretary, all of the other stockholders of the company will be notified that the secretary has the stock for sale and the first of the stockholders offering to take it will be given the preference. It proceeds: ''Out of a probable list of over 400 stockholders, there will always be someone who is ready to purchase more

of the stock; if there should not be, it will be sold to
someone else.   Our own stockholders, however, will
be given the first chance to get it.   When sold, the
money will be returned to the bank, to be again used
in purchasing other stock.''   The plan of loaning on
the stock is then set out but that is immaterial to con-
sider here as plaintiff declined to take a loan.   The
circular further sets out that as the stock is con-
stantly advancing in value it can always be disposed
of at what it cost the stockholder and in most in-
stances at a much higher figure as the market price
will always be paid for it, and the circular concludes:
''This department will add greatly to the value of
Torchon Lace & Mercantile stock, and will make it the
most desirable and sought after of any unlisted stock
on the market; in fact, it will be a safer stock to own
than a listed stock, as it will be free from the market
influences, which at times reduce the value of such
stocks to a point where great losses are sustained, as
instanced in the recent panic on Wall street.''   To this
printed circular, which was issued in 1907, is attached
the name of defendant corporation.   The corporation
was formed in 1906.   Plaintiff testified that Lewis,
handing him this circular, told him he had made ar-
rangements that plaintiff could have his money on
demand for the stock at any time.   He also told him
that there had been dividends of 12½ per cent de-
clared on the stock for several years and that in less
than six months the stock would be worth $16 instead
of $12.50; had no doubt it would never be worth less
than $12.50; that it was a 12 per cent dividend stock.
Plaintiff further testified that he had paid Lewis
$1250 for the stock; that he had paid it to Lewis indi-
vidually; that he had done so by check to Lewis' in-
dividual order and did not pay to the Torchon Lace
& Mercantile Company but to Sylvester Lewis, to
whom the check was payable and he repeated that it
was payable to the order of Sylvester Lewis; that he

had paid for the stock with this check which he gave to Lewis for the 100 shares of stock. He repeated that he had given his personal check to Lewis for the $1250 for the 100 shares of stock and that the check was payable to the order of Mr. Sylvester Lewis. Shown the check and it appearing that it was not to the order of Lewis but to the order of the Torchon Lace & Mercantile Company, plaintiff was asked how he happened to make it in that name and he said that Lewis had told him to do so and that Lewis had told him he represented the company and was president of the company; that he thereupon gave the check to Lewis and that he took it and got the money on it, he supposed. The check introduced in evidence by plaintiff, dated July 2, 1908, was payable to the order of the Torchon Lace & Mercantile Company for $1250 and was indorsed in the name of that company by Sylvester G. Lewis, as president. In this connection it is as well to state that the defendant company introduced in evidence two letters, one in the name of Caroline R. Wilson, the wife of plaintiff, the other by plaintiff himself, one of them without date, the other dated July 1, 1908, but both apparently delivered the same date, each addressed to the company, in each of which letters it is stated that $625 is inclosed, "same being payment for fifty shares of full paid and nonassessable stock of the Torchon Lace & Mercantile Company." One letter directs the issue of a certificate for fifty shares in the name of Caroline R. Wilson; the other directs the issue of fifty shares in the name of Dr. Charles A. Wilson, the evidence being as before stated, that while plaintiff paid all the money for the 100 shares, he had directed the division of the shares between himself and his wife. Plaintiff further testified that he had held this stock and he and his wife had received the dividend checks and the stock dividends on it until sometime in March, 1909, when he took the two certificates for fifty shares each to the

office of the company and showing them to Lewis, told him he wanted the money as he had made arrangements to buy land in California and wanted the money for the stock. Lewis commenced talking to him of different plans; said he would sell the stock if he could get the money. Plaintiff told him he had to have the money as he had made an arrangement to buy land at a certain time and he had to have the money. Lewis said, "Well, perhaps I can sell your stock before that time is up, but I can't give you the money on it." Plaintiff said to him, "That is not according to the way I got it." Lewis answered, "Well, I can't do it until I can sell the stock; I have no right to give you the money on that." Plaintiff offered to give him $60 if he would give him the money. Lewis not agreeing, plaintiff testified that he let the matter rest for probably two months or more and he went down to see Lewis again and showed him this circular in which the arrangement about getting money back was set out and Lewis got very indignant and mad; said he couldn't do it but he had it fixed so that he could borrow money on it, whereupon plaintiff testified that he became indignant, refused to make a loan and said that he had called to see him to see if there was any way he could get the money. Asked if there was anything said in the conversation about the former arrangement under which plaintiff had been induced to buy the stock, he said that Lewis merely discarded it; discarded everything; that plaintiff had said to him that he expected he would pay the money when he demanded it; that he had reminded him of that every time he saw him and that Lewis' answer to this was, "If I can sell the stock I will get you the money." Lewis tried to sell fifty shares of the stock at the time but no more and plaintiff kept writing to him and demanding the money and telling him he did not care how he got the money; that he wanted him to get it at once. On cross-examina-

tion plaintiff testified that he was in the general practice of medicine, making a specialty of certain branches and that he was familiar with business transactions. He repeated practically what he had testified to on direct examination; that fifty shares were in the name of his wife and fifty in his own name; that he paid for it, all of it; that he and his wife had received the cash and stock dividends on it; received the cash dividend the 15th of February, 1909; it came to them by way of check which they cashed; had not returned either this money or the additional shares of stock issued by way of dividends to the company, and which they had received about the 30th of January, 1909; had paid nothing in cash for these 33 1-3 shares but received them as dividends on the stock. They, plaintiff and his wife, had sold this dividend stock to a man named Vaughn. He testified that Lewis had given him no special written guarantee in the matter about returning his money any further than this paper circular which is before referred to but he had verbally assured him that he would. He further testified that Lewis had given him this circular letter to show him how he had done with others but that he (plaintiff) had made a special verbal contract with him and that the only written or printed guarantee which he had received was this circular which he had attached to his petition and which was introduced in evidence by defendant. He further testified that in all his correspondence about the matter he had addressed his letters to Lewis individually, and he did that because he was acting through Lewis, as president of the company. On redirect examination plaintiff testified that all his dealings with Lewis were as president of the corporation. He was asked if the written guarantee, the paper above referred to, was the only guarantee he had. He answered that it was not what he had in mind altogether; that what he had in mind was the conversation which he and Lewis had

had together; that when Lewis had showed him this
circular he told him that was an arrangement they
had with the company but that he would do better
with him and that he had then made his special ar-
rangement verbally; that he would give him back his
money at any time he wanted it. Beyond the testi-
mony of the stenographer for plaintiff, that she was
present and had heard some of the conversations be-
tween plaintiff and Lewis and the testimony of the
attorney for plaintiff, who testified to tendering the
stock certificates to Lewis as president of the company
and demanding the money, this was the testimony for
plaintiff.

At the close of plaintiff's testimony counsel an-
nounced that they dismissed as to the defendant Lewis
as an individual and that their case was against the
corporation alone. Counsel for defendant thereupon
asked a declaration of law that under the law and the
evidence plaintiff could not recover. This was refused
by the court, defendant duly excepting. Defendant
introduced Mr. Lewis as its witness, who practically
contradicted all of the testimony of plaintiff as to any
arrangement other than that he had told plaintiff that
if he wanted to sell his stock he thought he, Lewis,
could readily find a purchaser for it and would do his
best to help him sell it. He denied that he had de-
livered or shown plaintiff the circular letter referred
to, testifying that that was a plan that had been
adopted by their company at the outset, in 1907, but
on the advice of their attorney that it was an illegal
plan it had been abandoned and that he (witness) had
not given this circular to plaintiff; had not referred
to it in any way; that the company had abandoned the
plan set out in this circular long before he had com-
menced the negotiations with plaintiff; that the only
copies of this circular which had not been sent out
were in his desk in his office and might have been
picked up there, but he had not given one to plaintiff.

He further testified that plaintiff had applied to him to procure a loan of $300 on this stock; that he, Lewis, had negotiated a loan and that plaintiff thereupon declined it. Defendant also introduced in evidence the annual statement of the business of the company for the year ending 1909, dated February 12, 1909, which showed the total net worth over and above the liabilities and exclusive of value of copyrights of the property of the company, including cash on hand to be $106,267.04, its capital stock liability being $100,000. He also testified that the company was a going concern and paid dividends regularly. He specifically denied that he had ever had any authority from his company to make any agreement with plaintiff or anyone else, whereby the company was to buy back or take back its issued stock. This was practically the testimony in the case except that plaintiff being recalled, denied the statements of Lewis as to the manner in which he had procured the circular. There was no testimony in the case even tending to show that plaintiff had made any effort to sell the stock or dispose of it to any one other than to the defendant corporation, nor was there any evidence tending to show the market value of the stock or that it was without value or that it was not worth $1250. On the contrary the evidence tended to show that for some time, certainly during the time it was owned by plaintiff, it had been dividend paying stock.

The case therefore is entirely against the corporation and turns entirely upon the right of plaintiff to enforce the contract made with the defendant company through its president to buy back the stock at any time plaintiff should desire, paying him the amount paid by him for it less a transfer charge of 2 per cent. Mr. Lewis, as an individual defendant, is out of the case by the voluntary act of plaintiff. There is no pretense of evidence that any representa-

tions were made as to the value of the stock which turned out to be false or that there was any deception practiced upon plaintiff as to the condition of the company. The case stands as to fraud, solely on the promise of the company to pay back the purchase price of the stock on demand, inducing plaintiff to purchase on the faith of that promise, and on the failure of the corporation to fulfill that promise. The question in decision is, can plaintiff recover that purchase money either in an action at law or in equity? It is clear that this cannot be treated as an action at law for money had and received. It is more in the nature of a suit in equity to cancel a sale and a return of the consideration on the ground of fraud connected with that sale. It was tried on the theory that it was an action at law. Under our code, form is immaterial. We think that the scope of the petition and the facts place it as one peculiarly belonging to equity. The real gist of this case, as we understand it, must turn upon the right of the corporation to make this bargain which plaintiff claims in his petition he had with it, but which he seems to testify was with Lewis. The latter is out of the case, as it has been dismissed as to him. The plaintiff, in common with all men, must be presumed to know the law, and if he has parted with his money in reliance on a promise which the law says the defendant company has no power to make, he cannot compel the fulfilment of it especially when the contract remains, as here, an executory not an executed one.

Without going into an extensive discussion of the law governing the dealing of corporations with their stock, we think that we are concluded in this by the decisions of our own court, of the Kansas City Court of Appeals and of our Supreme Court construing the statutes of our State governing manufacturing and

business corporations and under which this defendant is organized. The section of the statute particularly applicable is Sec. 1327, R. S. 1899, now Sec. 3354, R. S. 1909, which provides the mode and manner of increase and decrease of the capital stock of manufacturing companies organized under our laws. Sec. 3354 has been amended by act of the General Assembly approved April 12, 1911 (Laws 1911, p. 147), by the addition of the proviso, but that proviso has no relevancy in this particular case. Our court in St. Louis Carriage Mfg. Co. v. Hilbert, 24 Mo. App. 338, construing what is now this section, held that in so far as it prescribes the manner in which manufacturing or business corporations may diminish their capital stock, the method therein prescribed is a limitation of the power to diminish it in any other way. It is there said by Judge ROMBAUER, who delivered the opinion (l. c. 343): "Even outside of the statute, the better reason is, that a trading corporation should not be permitted to traffic in its own stock, where by so doing it decreases the security which all parties dealing with it have in the individual liability of stockholders, for the unpaid part of the stock." The decision in this case was referred to approvingly in Dunlap v. Elks Social Club, 25 Mo. App. 180, l. c. 184; Bowman Dairy Co. v. Mooney, 41 Mo. App. 665, l. c. 676; Johnston v. Realty Co., 62 Mo. App. 156, l. c. 160, and its rule never either questioned or departed from in our State.

Later our court held in St. Louis Rawhide Co. v. Hill, 72 Mo. App. 142, l. c. 148, that unless the right is conferred by charter, the weight of authority both in this country and England tends to the establishment of the proposition that a corporation cannot buy its own stock.

In Boley v. Sonoro Development Co., 126 Mo. App. 116, 103 S. W. 975, the Kansas City Court of

Appeals held that a contract between a corporation and a stockholder, providing that the corporation at the election of the purchaser would take back the stock, he had purchased and return him his money, was an unlawful contract and one which could not be enforced, since creditors and stockholders would be injured thereby.

In Gill v. Balis, 72 Mo. 424, our Supreme Court held that the board of directors of a corporation have no power to diminish the capital stock of the corporation unless authorized by vote of the stockholders, and then, as we understand it, only in the manner provided by law.

Our Supreme Court in Alexander v. Relfe, 74 Mo. 495, a case cited by the learned counsel for respondent in support of the proposition that a corporation is equally responsible as an individual for the wrongs it commits and will not be heard to deny or evade its liability on the ground that those wrongs resulted from the exercise of powers not granted by the laws of its organization, has further held that the acts of a corporation in attempting to release stockholders and so practically decreasing the capitalization of the company, "were a fraud on the law, the settled policy of which is to sedulously protect the capital stock of corporations, and to steadily annul all arrangements or devices whereby that policy can be thwarted."

Again in Chrisman-Sawyer Banking Co. v. Independence Mfg. Co., 168 Mo. 634, 68 S. W. 1026, our Supreme Court, passing on the right of the subscriber to stock, who had not fully paid up, to escape from his liability, and holding that that could not be done by any device or arrangement with the company, its officers or of its stockholders, and considering the general doctrine as to the release of subscribers from their stock subscriptions or the withdrawal by the directors of the company of its stock by purchasing

it, holds the correct doctrine to be, that neither the corporation, its officers nor stockholders have any power to agree with a subscriber for stock that his subscription be cancelled, unless such power is expressly given to them by charter or statute, and that the only exception to the rule is the right of the company to protect itself by forfeiting stock where the subscriber fails to pay for it, or, in case of a dispute between the company and the stockholder as to his liability, the matter may be compromised and the stock surrendered, if done in good faith. Concluding on this subject, Judge MARSHALL, who delivered the opinion of the court, says (1. c. 645): "If the incorporators or stockholders could be allowed, as soon as the incorporation was completed, to sell out their stock to the company, and thereby escape liability for unpaid subscriptions, or in case the stock was fully paid, to receive back from the company the amount paid in, and to turn back to the company the stock subscribed, the doors for great frauds upon the creditors would be thrown wide open, and the consequences would not only be disastrous to creditors, but would also be fatal to the corporations themselves, inasmuch as no one would deal with corporations under such conditions. The statutes afford ample, honest and sufficient methods for reducing the stock of an incorporated company, and the rights of creditors as well as the interest of such companies are fully protected."

In Ashton v. Penfield, 233 Mo. 391, 135 S. W. 938, following State ex rel. Donnell v. Foster, 225 Mo. 171, 125 S. W. 184, our Supreme Court in effect recognizes the doctrine announced by our court in St. Louis Carriage Mfg. Co. v. Hilbert, supra, that where the statute provides a specific mode of procedure by or against corporations that mode is exclusive.

Learned counsel for respondent cite many authorities recognizing the right of a company to take back stock which it has sold, but so far as the cases

which so hold have been called to our attention, they were cases in which the stock sold was not of the original issue of the stock but in which the stock sold was what is known as "treasury stock," that is, stock that had once been subscribed for, paid for and issued by the company and subsequently turned back to the company for disposition for corporate purposes. It is true that in referring to that class of stock, the right of the corporation to bargain and sell it, to contract for cancellation of subscriptions to it, has been recognized. See for illustration Sherman v. Shaughnessy, 148 Mo. App. 679, 129 S. W. 245; Palais du Costume Co. v. Beach, 163 Mo. App. 499, 143 S. W. 852. But that does not meet the case at bar. This stock here involved is not treasury stock but was of the original issue of this corporation. Hence the decisions cited by counsel relating to treasury stock are inapplicable to it.

It is also argued by the same learned counsel that this is an executed contract and that when that is the case the plea of *ultra vires* will not be entertained. That is a mistake as to the facts in this case. This was not an executed but is an executory contract so far as the corporation itself is concerned. If the corporation had redeemed these certificates of stock and paid back to the stockholder the money he had paid for them and received from him the certificates and that transaction had been attacked by a creditor or stockholder, the plea of *ultra vires* would hardly have overturned the transaction. Tierney v. Butler, 144 Iowa, 553, 123 N. W. 23, cited by counsel, illustrates this. But when the transaction is one not permitted or which is forbidden by law and not merely in excess of but contrary to the charter powers of the company, the plea of *ultra vires* is available (Cass County v. Mercantile Town Mut. Ins. Co., 188 Mo. 1, l. c. 15, 86 S. W. 237); and we have seen that the mode

prescribed by our statute for reduction of the capital stock of a corporation is exclusive.

Here the plaintiff seeks affirmative action from the court to compel this corporation to do something which under the authorities we have referred to is outside of the power of that corporation to do, namely, to carry out a contract for the redemption or purchase of its own stock, by repaying to him what he had paid for the stock. The only fraud pretended here is the averred fraud in refusing to carry out the contract to purchase back this stock. Counsel seem to argue that this is to be treated as an action for money had and received. While that form of action to a certain extent engrafts equitable principles upon actions at law, it surely cannot be used to evade the application of settled equitable principles. Looking at the equities of this case, this plaintiff received a large number of shares of stock as dividends pertaining to this stock; he also received a large sum of money by way of dividend on the stock. He retains all this, making no offer of refund of the money received or to return the dividend stock, 33 1-3 shares. On the contrary he has placed the latter out of his power to return by having sold and transferred it to an outside party. So that as far as the equities of the case are concerned, plaintiff does not come into court with clean hands.

It is argued that plaintiff's purchase of the stock was a conditional one. The facts negative this claim. Plaintiff was so completely owner of the purchased shares that he received and appropriated and still holds on to the increment of the stock; the cash and stock dividends. This is not now an action against Lewis, as an individual or as the president, manager and agent of the company; plaintiff dismissed as to him, although he testified that his dealings were with him and that he bought the stock from him relying on his promise and that he gave the check for the

money made out in his name to him individually. This action is against the corporation alone, founded on a contract not only not shown to have been made by authority of the corporation and which we hold the corporation itself could not make and could not authorize any agent to make; an unlawful, invalid contract, and one which Lewis testifies he had no power or authority from the company to make.

Counsel argues in support of the judgment of the trial court that "the carrying out of its contract with plaintiff would have taken but a very small part of its (appellant's) surplus and could not have impaired its capital or damaged its creditors or the other stockholders, if others there were." We cannot agree to this. Even if true in fact, the question of lack of corporate power remains. But it cannot be true that taking from the corporation any part of its working, authorized, legal, capital is not against the interest of those who may give credit to the company; it surely is to the detriment of the stockholders.

That same counsel argues that no stockholders are here complaining of the act of the company, save Mr. Lewis. That is beside the case. The corporation here speaks for its stockholders; Lewis surely complains, and counsel for respondent asserts that he is a stockholder and apparently the sole stockholder. But respondent has put Lewis out of court by dismissing as to him. If the corporation had failed to assert the rights of its stockholders, it would possibly have been open to them to intervene; but the corporation defending has rendered that unnecessary.

On all these considerations we are compelled to hold that the finding of the learned trial court in favor of plaintiff was wrong; that on the facts in evidence in this case plaintiff cannot recover. The judgment of the circuit court is reversed. *Caulfield, J.,* concurs. *Nortoni, J.,* dissents.