FRANK J. PASOTTI,

*vs.*

UNITED STATES GUARDIAN CORPORATION, a dissolved
corporation of the State of Delaware.

*New Castle, June* 16, 1931.

*Arthur G. Logan,* of the firm of Marvel, Morford, Ward
& Logan, and *Dudley C. Lunt,* for receivers.

*James H. Hughes, Jr.,* of the firm of Ward & Gray, and *Paul Leahy,* for holders of certificates of indebtedness.

THE CHANCELLOR: If the so-called certificates of indebtedness be disregarded, all the creditors of the dissolved corporation have been either paid or provided for. Whether the certificates of indebtedness constitute evidences of debt is one of the questions to be answered.

The receivers have in hand for distribution cash, and Liberty Bonds in the amount of approximately fifty thousand dollars.

The authorized stock of the corporation consists of three kinds, viz., first preferred stock (par fifty dollars) of which 3,482 shares are outstanding; second preferred stock (par fifty dollars) of which 111 shares are outstanding; and common stock (no par) of which 24,253½ shares are outstanding. The preferred stock is entitled on dissolution to receive fifty dollars per share. There being about one hundred and seventy-five thousand dollars of first preferred stock outstanding, the second preferred and the common can therefore have no interest in the distributable fund of fifty thousand dollars.

The principal question before the court has to do with the relative rights of holders of first preferred stock on the one hand and holders of what are called certificates of indebtedness on the other, and this question turns on whether the holders of the certificates of indebtedness are to be treated as creditors outranking all stockholders, or as subscribers for stock who have paid in part therefor and who therefore possess the status of mere part-payment stockholders. A statement of the nature of the contracts of subscription is necessary to show how this question arises.

All of the stock of the corporation was subscribed for by contracts for the purchase of stock in units. There were four types of such contracts. Though the four contracts varied with respect to a few details, they all had in common

the one feature which is of importance here upon which the question in hand turns. It will suffice for the present purpose to describe only one of the types of contract.

By its terms the subscriber agreed to buy and the corporation agreed to sell a designated number of shares of first preferred stock and a designated number of shares of second preferred stock (two shares of first preferred and one share of second preferred constituting a unit) at one hundred and thirty-five dollars per unit, payable either immediately in full or so much down and so much per month until paid in full. The corporation agreed that the instalment payments should draw four and one-half per cent. interest compounded semi-annually, which interest should be paid to the subscriber within thirty days after the completion of the contract. The contract also provided that failure to make five successive monthly payments after the initial payment would work a forfeiture of the contract and all moneys theretofore paid thereon. But, when six monthly payments had been made, upon a failure thereafter to make five monthly payments "a certificate of indebtedness will be automatically issued for the full sum paid upon the within contract, as of the date of the said delinquency. The said certificate will bear four and one-half per cent. (4½%) interest, compounded each six (6) months and payable to the holder thereof, with said interest added, in conformity with the table of determination."

It was provided that when the full purchase price was paid, the corporation was bound to issue to the holder of the contract the fully paid shares subscribed for. But, "in the event of the issuance of a certificate of indebtedness, as above provided, all rights to receive the said certificate of stock under this agreement shall cease."

What the "table of determination" was, does not appear. The receivers on their brief describe it as follows: The corporation expected to earn fifteen per cent. on its money—a rather rosy hope in view of the sequel. After allowing for the stipulated four and one-half per cent. in-

terest, there would be left out of the expected annual earnings ten and one-half per cent. This, the corporation was willing to pay to the subscribers furnishing the money in case they desired to discontinue the payments. But inasmuch as a substantial commission had to be paid to salesmen for securing subscriptions, the corporation would have in hand only a portion of the cash paid on which the hopeful fifteen per cent. could be earned. Therefore, in order to figure safely, it had to determine how long it would take for the sum paid less commissions to earn enough at ten and one-half per cent. plus four and one-half per cent. to equal, with the base, the total paid by the subscriber, that is the face of the certificate of indebtedness. The so-called table of determination was compiled to show the length of time necessary for that purpose. When the time was thus computed, the certificate of indebtedness for the full amount paid was issued with an appropriate due date fixed in the future.

There appear to be outstanding certificates of indebtedness in the amount of $4,291.00, some of which have been presented as claims by the holders who allege themselves to be creditors and entitled to be treated as such. It appears also that certificates of indebtedness in the amount of $19,269.83 should, under the terms of the contracts, have been "automatically" issued to subscribers but never were. Such subscribers have not as yet filed claims as creditors.

The receivers take the position that the holders of certificates of indebtedness who have filed their certificates are not entitled to be treated as creditors; that the terms of the contract by which the corporation agreed to become indebted for the subscription money paid was *ultra vires* and void; and that the subscribers are therefore to be given the status of partly-paid stockholders and allowed to participate in the distribution in that status only.

By signing the subscription contract, the subscriber undertook to assume the status of stockholder. There was no condition precedent specified in the contract upon the

arising of which his assumption of that status was predicated. There was, however, a condition subsequent upon the happening of which the contract provided that the relationship of stockholder to the corporation would terminate and become converted into that of a creditor. This arrangement is not to be distinguished in principle from that whereby a person subscribes and pays in full for stock with an agreement on the part of the corporation to re-buy it from him at a stipulated price. Where such an agreement is made, this court has held it to be void, if in order for the corporation to carry it out its capital will suffer an impairment. *In re International Radiator Co.*, 10 *Del. Ch.* 358, 92 *A.* 255, 256. The case, however, which so held was an insolvency case. In such a case, recognition of the agreement would be at the expense of the rights of creditors. The authorities are in unanimity upon the proposition that a contract obligating a corporation to repurchase shares of its own stock from an original subscriber, is void as against creditors.

In the instant case there are no creditors, and the cited case may therefore be said not to be controlling in this one. It is to be observed, however, that Chancellor Curtis in the *International Radiator Case,* in addition to pointing out that the general law of corporations condemned a contract by a corporation to repurchase shares of its own stock when such repurchase would effect an impairment of capital, also adverted to the expressed prohibition of the statute of this State which then forbade, as it still does, the purchase of its own shares by a corporation, "when such use [of its funds] would cause any impairment of the capital of the corporation." *Section* 19 (36 *Del. Laws, c.* 135, § 10). In substance he held that a contract of a corporation created under the Delaware act to purchase its own shares out of capital assets is made illegal and void by the statute. "In other words," he said, "a corporation may use only its surplus for the purchase of shares of its own capital stock."

At the time when the case was decided in which that

language was used, *Section* 28 of the act (*Rev. Code* 1915, § 1942) permitted a reduction of capital, among other ways, "by the purchase at not above par of certain shares for retirement," provided the debts of the corporation which were not otherwise fully secured were paid and discharged. *Section* 28 as it then existed. made no provision as to the source from which funds for the purchase could be drawn. The categorical language quoted *supra* from the opinion of the Chancellor in the *International Radiator Case* if given a generality of application, would indicate that only surplus could be used to purchase shares for reduction purposes under *Section* 28. But if the general nature of his language is restricted in its application to the facts of the case before him, as it should be, it is not to be taken as having any interpretative significance with respect to *Section* 28.

Since the decision of the *International Radiator Case* in 1914, the statute has been amended (36 *Del. Laws,. c.* 135, § 14) by changing *Section* 28 so as expressly to allow the use of capital funds for the purchase of shares in order to effectuate a reduction of capital; and also by allowing the use of capital funds for the purpose of redeeming preferred and special shares subject to the provisions of the certificate of incorporation (*Section* 27 [36 *Del. Laws, c.* 135, § 13]). It has further been amended by providing that the inhibition of *Section* 19 against the purchase of shares when such purchase would cause an impairment of capital shall not be construed as limiting the rights given by *Section* 27.

What is the combined result of *Sections* 19, 27 and 28 as they now appear in the law, I am not called upon by the facts of the instant case to say. This is because the corporation's act in agreeing in substance to purchase the shares subscribed for by the holders of the certificates of indebtedness, was not undertaken as an exercise of power conferred either by *Section* 27 or by *Section* 28. Therefore the case stands flatfootedly on *Section* 19. Inasmuch as the proposed purchase would have worked an undoubted

impairment of capital, the provisions of that section prohibited it.

In the *International Radiator Case, supra,* the Chancellor in holding that a contract to repurchase shares was illegal and void when an impairment of capital resulted therefrom, was speaking of a situation where creditors were concerned. Creditors of course are very differently posited with respect to a corporation than are stockholders. But with respect to the prohibition against the impairment of capital by the purchase of its own shares by a corporation, stockholders in only a different way from creditors are very vitally concerned. The statute I think designs the prohibition of *Section* 19 against impairment of capital for the protection of stockholders as well as of creditors. It may be that stockholders can estop themselves against asserting this protection. This I do not decide, leaving it open. In *Winston v. Dorsett Pipe Co.,* 129 *Ill.* 64, 21 *N. E.* 514, 4 *L. R. A.* 507 cited on this point by the solicitors for the certificate holders, the question of impairment of capital by purchase of stock was not involved. A question was made in that case of whether a stockholder was liable on his subscription to be assessed along with his co-stockholders for the benefit of creditors. The court held that while every stockholder has a vested right in the contract of subscription of every other stockholder, yet this right could by agreement of all the stockholders be waived so as to relieve a given stockholder from assessment for the benefit of creditors until after the subscription liabilities of all the other stockholders had been exhausted.

If by a parallel of reasoning it be said that legally it would be possible for the stockholders in this case to have agreed to permit any subscriber to stock to turn himself into a creditor with a right to be paid out of the capital contributed by others, it is sufficient to answer that no such agreement was made. The fact that all of the stock was subscribed for under contracts containing terms similar to those under which the holders of the certificates of in-

debtedness subscribed, does not show an agreement among the stockholders. Each stockholder dealt independently with the corporation and presumably in ignorance of the dealings of the others. There was no concert of agreement among the stockholders *inter sese* as in the Illinois case just cited. In the instant case there was simply the negotiation by the corporation of a number of individual subscription contracts, all of which were forbidden by the law if in order to carry them out the corporation would be required to impair its capital. Each stockholder who entered into such a contract was bound to take notice of the limitations upon performance which the statute imposed. *In re International Radiator Co., supra.*

Neither do I conceive that stockholders who entered into such contracts with the corporation and who, instead of becoming entitled to certificates of indebtedness as creditors, continued their payments and became fully paid stockholders, can be said to have waived their right to insist that the status of creditors be denied to the subscribers who by reason of their default now hold certificates of indebtedness. Each subscriber dealt independently with the corporation and so far as is disclosed had no hand, directly or indirectly, in inducing the others to subscribe under similar terms. The element of knowledge on the part of fully paid stockholders of the subscription contracts entered into by the claimant certificate holders is also lacking.

The conclusion on this branch of the case is that holders of certificates of indebtedness are to be treated not as creditors but as subscribers for stock who have paid in part the purchase price thereof. The Delaware case of *In re International Radiator Co., supra,* though a case in which creditors' rights were concerned, nevertheless in its logic supports this conclusion.

The solicitors for the holders of the certificates of indebtedness cite numerous authorities in support of their position. A number of them are cases in jurisdictions where

no such statutory provisions appear to have existed as are found here. Among these are *Vent v. Duluth Coffee & Spice Co.*, 64 *Minn.* 307, 67 *N. W.* 70 (criticized in *Allen v. Commercial National Bank*, [*C. C. A.*] 191 *F.* 97) ; *Hinton v. Morris County Co-Operative Society*, 21 *Kan.* 663; *Harvey v. Weitzenkorn*, 232 *Pa.* 447, 81 *A* 447. The case of *Cook, Assignee, v. Chitenden*, (*C. C.*) 25 *F.* 544, is distinguishable on the ground that it involved a mere agreement to cancel a subscription at a time when the corporation was solvent, and did not involve a demand by a subscriber for repayment out of capital. *Bent v. Underdown, et al.*, 156 *Ind.* 516, 60 *N. E.* 307, has no applicability because of the peculiar statutory provisions under which it was decided. *Winston v. Dorsett Pipe Co.*, 129 *Ill.* 64, 21 *N. E.* 514, 4 *L. R. A.* 507, turned on an estoppel raised under facts which find no analogy in this case. In *Jones v. Johnson*, 86 *Ky.* 530, 6 *S. W.* 582, the defendant had an option contract by which he was given time within which to decide whether he would become a stockholder. He never became such, whereas in the instant case the relationship of stockholder was created and it is sought to end it by a condition subsequent. *Kirby v. Wilson*, (*C. C. A.*) 27 *F.* (2*d*) 327, involved a condition precedent. *Lellyett v. Brooks, et al.*, (*Tenn. Ch. App.*) 62 *S. W.* 596, is not in point. It was a case where the corporation while solvent agreed to cancel subscription contracts and thereupon issued stock for a fraction of the amount paid on account of the subscription. It was held that subsequent creditors could not compel payment of the original subscriptions. *Mulford v. Torrey Exploration Co.*, 45 *Colo.* 81, 100 *P.* 596, involved a sale by the company and agreement to repurchase so-called "treasury" stock. Where such stock is concerned, there is authority to the effect that the obligation to repurchase is binding whereas it would not be if the stock were of the original issue. See *Allen v. Commercial National Bank, supra*, and *Wilson v. Torchon Lace, etc., Co.*, 167 *Mo. App.* 305, 149 *S. W.* 1156.

The foregoing review embraces the principal cases

cited in support of the position of the holders of certificates of indebtedness. They do not seem to me to be of weight against the statutory provisions found in this State.

The holders of certificates of indebtedness are therefore to be treated as subscribers to stock who have made part payment. On what basis they should be treated in the distribution as against fully paid stockholders, a question raised by the receivers, is answered by *Penington v. Commonwealth Hotel Construction Co.,* 17 *Del. Ch.* 188, 151 *A.* 228, affirmed on the point in question by the Supreme Court 17 *Del. Ch.* 394, 155 *A.* 514. Nothing further need be added to the opinion filed in that case.

The final question is—how shall the part payments made on account of subscriptions be allocated? To illustrate, if a person subscribed for a unit (two shares of first preferred and one share of second preferred) at one hundred and thirty-five dollars, paid fifty-five dollars and then discontinued, to what stock should his payments be credited?

The receivers suggest that inasmuch as the par of each of the two stocks was fifty dollars, the contract should be taken as providing that the subscriber would pay one hundred dollars for the two first preferred shares and thirty-five dollars for one share of second preferred. Why this should be so I am unable to see. The contract does not so specify. But passing by that point, the receivers further suggest that the fifty-five dollars paid should be first applied to take upon the thirty-five dollars assumed to be the subscription price of the second preferred share. That would leave twenty dollars to be applied on account of two shares of first preferred, which would mean the cost of two-fifths of a share of first preferred. The receivers would thus regard the subscriber as the holder for distribution purposes of two-fifths of a share of first preferred stock.

I am unable to agree with the receivers' views in this regard. It is apparent that the unit was subscribed for at less than par. Why, the contract being silent on the point,

it should be considered that the first preferred was subscribed for at par and the second preferred at less than par, as the receivers contend, it is impossible for me to see. There would be just as much reason, or rather just as little, to say that the second preferred was subscribed for at par and the first preferred at less than par. The contract must be regarded as a subscription for a unit of three shares at less than par. If the price of the second preferred is to be first deducted from the supposed fifty-five dollar payment, as the receivers contend, then only one-third of fifty-five dollars should be deducted instead of the receivers' suggested thirty-five dollars.

But it is improper to require the second preferred to bear the whole of its cost price out of the fifty-five dollar payment, and credit the remainder to the first preferred. As the stock was subscribed for in a unit and since the subscription contract made no allocation of the partial payments to any particular one or more of the shares subscribed for, the equitable thing to do is to consider that the payments when made were applicable to each share on a proportionate basis. That being so, the fifty-five dollars which we are imagining a subscriber to have paid on account of the two shares of first preferred (one hundred dollars total par) and the one share of the second preferred (fifty dollars par), is to be regarded as having been paid, two-thirds on account of the first preferred and one-third on account of the second preferred.

The foregoing answers all the questions upon which the receivers desire to be instructed.

Order accordingly.