**In re QINTEX ENTERTAINMENT, INC., Debtor.**

**Robert HALMI, Sr., Appellant,**

v.

**QINTEX ENTERTAINMENT, INC., Appellee.**

No. 92–55081.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 15, 1993.

Decided Nov. 2, 1993.

Stephen F. Biegenzahn, Varet Marcus & Fink, Los Angeles, CA, Arthur H. Ruegger, Varet Marcus & Fink, New York City, for appellant.

Irv M. Gross, Robinson, Diamant, Brill & Klausner, Los Angeles, CA, for appellee.

Before: GIBSON,[*] HALL, and KLEINFELD, Circuit Judges.

FLOYD R. GIBSON, Senior Circuit Judge:

Robert Halmi appeals the district court's affirmance of the bankruptcy court's decision disallowing his claim for administrative fees and expenses. We affirm.

[*] The Honorable Floyd R. Gibson, Senior Circuit Judge from the Eighth Circuit, sitting by designa-

## I. BACKGROUND

Halmi was a director and shareholder of Qintex Entertainment Inc. ("QEI"). Additionally, pursuant to an employment agreement signed in April 1988, Halmi produced TV programs for QEI. The agreement required Halmi to devote his "full time and best efforts to his duties under the Agreement." He was prohibited from committing to projects on QEI's behalf without first receiving written approval and from working on projects for himself or others. In return, Halmi received a salary, production fees, office, staff, and reimbursement for certain expenses. The agreement also contained a put option that required QEI to buy all of Halmi's stock in QEI if certain conditions were met. The relevant condition required that Halmi not voluntarily terminate his employment before April 1, 1990.

In October 1989, for reasons unrelated to the agreement, QEI filed for relief under Chapter 11 of the Bankruptcy Code. QEI then sought to reduce its expenditures; to this end, it was suggested that Halmi's salary and staff be cut. Halmi's son ("Halmi Jr.") negotiated on behalf of Halmi, and John Lloyd, QEI's president, negotiated on behalf of QEI. A modification to Halmi's employment agreement was eventually agreed to and was signed on November 2, 1989. The modification provided that Halmi would be released from the exclusivity requirement of the original agreement. Halmi was also to lose his rights to salary, staff, office, and reimbursement for expenses. In exchange, Halmi received all of QEI's rights to six specific film projects. If principal photography started on one of the projects within one year, QEI would reimburse Halmi's expenses and receive a share of the revenues related to that project. If principal photography for a project did not commence within one year, all rights in that project were to revert to QEI.

The modification does not specifically mention the put option, and the parties agree it was never mentioned during the negotiations.

tion.

Lloyd testified he never thought about it, and Halmi testified he figured the put option survived the modification; otherwise, he would not have agreed to the modification. The modification does state that except as expressly set forth, the terms and conditions of the agreement remain in effect.

The Bankruptcy Court approved the modification on November 16, 1989. On April 2, 1990, Halmi tried to exercise the put option, but QEI refused to honor it. Halmi then filed a motion to compel payment per the terms of the option as an administrative expense,[1] but the bankruptcy court denied the motion on two grounds: 1) Halmi voluntarily terminated his employment in November 1989 by agreeing to the modification; and 2) Delaware law prohibited QEI from buying back his stock because the company's capital was impaired. Additionally, as an alternative basis for denying Halmi's motion, the court held that assumption of the modification was void because the court approved it without giving reasonable notice to all interested parties (i.e. QEI's creditors) that the put option survived the modification, thereby denying their due process right to oppose the modification. The district court affirmed the bankruptcy court, relying principally on the prohibition in Delaware law. Halmi appeals.

## II. DISCUSSION

### A. The Effect of Delaware Law

■ Like the district court, we will focus our discussion on the validity of the option under Delaware law.[2] We review the bankruptcy court's conclusions about Delaware law de novo. *Dewhirst v. Citibank (In re Contractors Equip. Supply Corp.)*, 861 F.2d 241, 243 (9th Cir.1988). Title 8, § 160 of the Delaware Code prohibits a corporation from purchasing shares of its own stock "when the capital of the corporation is impaired or when such purchase or redemption would cause any impairment of the capital of the corporation...." The statute implicitly

authorizes "a corporation to use its property for the purchase of its own capital stock if such use will not impair its capital." *Alcott v. Hyman*, 208 A.2d 501, 508 (Del.1965). A company's capital is impaired if "the value of its assets is less than the aggregate amount of all the shares of its capital stock." *In re International Radiator Co.*, 92 A. 255, 256 (Del. Ch. 1914); *Stanley v. Brock (In re Kettle Fried Chicken of Am., Inc.)*, 513 F.2d 807, 811 (6th Cir.1975) (applying Delaware law). The parties agree QEI's capital became impaired sometime between the signing of the agreement and the signing of the modification and, once impaired, remained impaired at all times relevant to this proceeding.

In 1974, the following language was added to § 160:

Nothing in this subsection shall invalidate or otherwise affect a note, debenture or other obligation of a corporation given by it as consideration for its acquisition by purchase, redemption or exchange of its shares of stock if at the time such note, debenture or obligation was delivered by the corporation its capital was not then impaired or did not thereby become impaired.

Halmi argues the 1974 amendment makes clear that the relevant date for determining whether the company's capital is impaired is the date when the put option was granted and not the date he exercised the option. He relies heavily on a Seventh Circuit opinion construing the statute in which that court said "the relevant time at which to evaluate whether the corporation's capital has been impaired is the time at which the challenged obligation was entered into." *Libco Corp. v. Leigh (In re Reliable Mfg. Corp.)*, 703 F.2d 996, 1002 (7th Cir.1983). We believe Halmi's reliance on *Reliable Mfg.* is misplaced.

■ The dangers inherent in permitting corporations to deal in their own shares have long been recognized. *See* 6A William A.

---

**1.** 11 U.S.C. § 503(b)(1)(A) (1988) (Allowing as an administrative expense "the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case").

**2.** We express no opinion on the other grounds relied on by the lower courts.

Fletcher, *Fletcher Cyclopedia of the Law of Private Corporations*, §§ 2845–2847 (rev. ed. 1989) (hereinafter *Fletcher*). Restrictions on the practice are designed to protect both creditors, *Propp v. Sadacca*, 175 A.2d 33, 38 n. 3[3] (Del. Ch. 1961), *rev'd in part and aff'd in part*, 187 A.2d 405 (Del.1962), and shareholders, *Fletcher*, § 2849; *see also Pasotti v. United States Guardian Corp.*, 156 A. 255, 257 (Del. Ch. 1931). Many states have enacted statutes that, like Delaware's § 160, allow a corporation to purchase its own stock so long as its capital is not impaired. However, two recurring situations have arisen that pose problems in applying such statutes. The first problem involves installment purchases; that is, when the corporation purchases its stock and pays for it not with cash, but rather with a note. Some jurisdictions require sufficient capital at the time the note is made, others require it at each time a payment is due, and still others require sufficient capital at both times. Robert C. Clark, *Corporate Law*, § 14.6 (1986). The second problem involves a corporation's promise to purchase its shares at some future time. In cases in which a corporation agreed "to repurchase its shares, the older cases required legally available funds both at the time the agreement was made and at the time of performance. The modern trend is to uphold such agreements as valid, regardless of the situation at the time of the making of the agreement, and to enforce them, ... *to the extent that the corporation has legally available funds at the time of repurchase.*" Harry G. Henn & John R. Alexander, *Laws of Corporations* 939 n. 1 (1983) (emphasis added). The case at bar falls into the latter category, whereas the 1974 amendment to § 160 and the situation in *Reliable Mfg.* fall into the former category.

▮▮▮ By its terms, the amendment applies when a "note, debenture or obligation" is given "as consideration" for the acquisition of stock. The term "obligation" should be construed as referring to non-money payments for stock that require some future performance, such as a note that requires the payment of money at specified times in the future. Thus, if QEI obtained its stock in return for a 5–year note, § 160 would permit payment on the note so long as QEI's capital was not impaired when the note was delivered. This, of course, is not what happened in this case; QEI never received the stock, nor did it deliver an obligation in the manner we have described. Halmi misconstrues the term "obligation" as it appears in the amendment and reads it to apply broadly to any contractual obligation to buy stock. Moreover, Halmi's put option was not given to him "as consideration" for his stock; it was given to Halmi as consideration for his agreeing to work for QEI as an employee. In reality, QEI never gave Halmi anything "as consideration" for his stock—that is why this dispute exists in the first place. For these reasons, the amendment does not enable the corporation to redeem the shares.

Our interpretation of the statute is consistent with, and supported by, the Seventh Circuit's decision in *Reliable Mfg*. In that case the corporation had delivered an obligation (in the form of a guaranty),[4] so the amendment properly applied and permitted payment on the guaranty because the corporation had sufficient capital when the guaranty was made. 703 F.2d at 1002. In discussing the argument that the statute prohibited the purchase "if the purchase would impair capital as of the date when the price must be paid"—an argument that parallels the reasoning of the district court in this case—the Seventh Circuit noted that "[s]uch a rule may be sound in cases involving straightforward executory contracts to purchase stock from a corporation's shareholders, where the extension of Section 160's prohibition to executory agreements is dictated by the policy underlying that statute." *Id.* at 1002. However, as recognized by the amendment, when a corporation gives a note or other obligation as consideration for its stock, "[p]rior creditors [are] not defrauded by the transaction, since the corporation had adequate capital; and all

---

3. In some editions of volume 175 of the Atlantic Report (second edition), this footnote is misnumbered as footnote 2.

4. The court recognized it was "questionable" whether the transaction constituted a "purchase or redemption" within the meaning of § 160, but assumed it was for the sake of discussion. 703 F.2d at 1001.

future creditors [are] on notice that [the corporation's] assets [are] encumbered...." *Id.* Thus, *Reliable Mfg.* recognized the distinction between a promise to purchase stock and a note used to pay for stock, and recognized the 1974 amendment to § 160 speaks only to the latter category of transactions.[5]

Given that the 1974 amendment does not speak to this transaction, we think it obvious § 160 prohibited QEI from honoring Halmi's put option. When Halmi exercised the option, he was effectively invoking a contractual right to force QEI to purchase stock, with the purchase to take place on April 2, 1990. Inasmuch as QEI's capital was impaired on that date, the transaction could not be permitted under Delaware law. *Accord, Pasotti*, 156 A. at 256 (where an agreement requires corporation to rebuy stock at a stipulated price, the agreement is void "if in order for the corporation to carry it out its capital will suffer an impairment."); *see also Fletcher*, § 2852 (a corporation "may agree with a prospective purchaser of stock from it to refund his or her money and take back the stock on a certain future date at the purchaser's option, ... provided the rights of creditors are not affected, such as by impairment of capital....") (footnotes omitted).

## B. Restorative Relief

■ Halmi argues that even if the put option is unenforceable under Delaware law, the bankruptcy court should not have severed that portion of the employment agreement without restoring him to the status quo. As explained at oral argument, Halmi essentially seeks to invalidate the modification and be paid the salary due under the original agreement for all the work he performed after the modification was signed. Halmi offers two alternative justifications for the remedy he seeks: first, the put option was not incidental to the employment agreement; second, Halmi would not have agreed to the modification had he known the option was unenforceable. Because both premises are flawed, Halmi is not entitled to restoration.

Halmi's first rationale invokes *Artache v. Goldin*, 133 A.D.2d 596, 519 N.Y.S.2d 702, 705 (1987),[6] where the court stated that when "an agreement consists in part of an unlawful objective and in part of lawful objectives, the court may sever the illegal aspects and enforce the legal ones, so long as the illegal aspects are incidental to the legal aspects and are not the main objective of the agreement." We note at the outset that *Artache* is inapplicable because the bankruptcy court did not sever the illegal aspects from the employment agreement and enforce the legal aspects; the legal aspects were already performed, the illegal aspects were still unperformed, and the bankruptcy court simply left the parties in the position they were when they came to court. Furthermore, requiring the corporation to pay more money to Halmi causes the very harm § 160 was designed to prevent because it allows him to step ahead of the other shareholders and dilute the pool of funds available to the creditors. Thus, we see no basis in law or fact for awarding any relief to Halmi.

As for Halmi's claim that he thought the put option was valid, we are not persuaded that Halmi's belief entitles him to any relief. Delaware courts have long held that "[a]ny one [sic] dealing with the corporation is bound to know the limitations put on it by the statute under which it was created." *International Radiator*, 92 A. at 256; *see also Pasotti*, 156 A. at 257; *Kettle Fried Chicken*, 513 F.2d at 813 ("the shareholder's lack of knowledge of the illegality cannot be controlling and the transaction is voidable by the trustee for the creditors"). The logic of this

---

5. Halmi also relies on *In re Motels of America, Inc.*, 146 B.R. 542 (Bankr.D.Del.1992). The court did appear to support Halmi's position when it relied on *Reliable Mfg.* for the proposition that the 1974 amendment "'strongly suggests that the relevant time ... is the time at which the challenged obligation was entered into.'" 146 B.R. at 544 (quoting *Reliable Mfg.*, 703 F.2d at 1002). We note, however, that the *Motels of Am.* court did not fully discuss the issues necessary to resolve the instant case, and instead denied the challenge on a purely factual ground; namely, there was "no evidence showing [the corporation's capital] was impaired when the agreement was formed, or at any subsequent prepetition time." *Id.* (the option holder sought redemption before the debtor filed for bankruptcy). For this reason, we do not find the case particularly helpful in this situation.

6. New York law governs the employment agreement and the modification.

rule is inescapable—were ignorance to be a valid defense, the creditors and shareholders would suffer the very harm the statute is designed to prevent. We hold that Halmi's mistaken belief of law does not provide grounds upon which he can obtain any form of restorative relief.

## III. CONCLUSION

QEI's capital was impaired at the time Halmi attempted to exercise the put option, so Delaware law prohibits both QEI from purchasing its stock and the courts from enforcing its promise to do so. Halmi is not entitled to any other form of relief related to the loss of the put option,[7] so the district court is AFFIRMED.

---

7. QEI has confirmed and substantially consummated its plan of reorganization. *See* 11 U.S.C. § 1101(2) (1988). Any unsecured claim Halmi might have had against QEI from the put option has therefore been discharged. *See Id.* § 1141(d)(1)(A); *In re Benjamin Coal Co.*, 978 F.2d 823, 827 (3d Cir.1992).