R. P. BURNS, RESPONDENT, v. WESTERN PROTECTIVE INSURANCE COMPANY, APPELLANT.*

Kansas City Court of Appeals.   June 11, 1928.

*Corpus Juris-Cyc References: Appeal and Error, 4CJ, section 2708, p. 764, n. 80; Brokers, 9CJ, section 59, p. 556, n. 99; section 61, p. 561, n. 30; section 92, p. 608, n. 90; section 108, p. 634, n. 36; section 121, p. 651, n. 24; section 127, p. 654, n. 41; Corporations, 14CJ, section 204, p. 197, n. 62.

*Nourse & Bell* and *Henri L. Warren* for respondent.

*James S. Summers* and *Yates & Tiplon* for appellant.

BLAND, J.—This is a suit to recover commissions on sales by plaintiff of certain capital stock of the defendant. There was a verdict and judgment in favor of plaintiff in the sum of $3175 and defendant has appealed.

Defendant insists that its demurrer to the evidence should have been sustained. In view of this contention it is necessary for us to state the facts and all reasonable inferences that may be drawn therefrom in favor of the plaintiff. The facts show that the defendant was incorporated in 1923 under the laws of the State of Missouri as an insurance company on the stipulated premium plan; that from and after January 14, 1924, it began and continued to do business as a stipulated premium insurance company until August 25th of that year when, upon the amendment of its charter under the provisions of section 6186, Revised Statutes 1919, it became an old line legal reserve insurance company with a capital of $200,000.

According to the evidence, it was unnecessary for defendant, while it was a stipulated premium insurance company, to have all of its

capital stock "sold." But under the provisions of section 6126, Revised Statutes 1919, it was required, before commencing or continuing to do business as an old line company, to have the full amount of its capital stock in good faith subscribed, and at least $100,000 of its stock paid in and invested in various securities named in the statute. It is further provided in that section that an old line company shall not have the right to commence or continue business "until it holds for the balance unpaid on all its capital stock subscribed for, the notes of the respective subscribers with good and sufficient security therefor, other than the stock of the company."

It appears that the defendant company sometime in the year 1924, the exact time not being disclosed in the evidence, decided to amend its charter so as to come within the provision of the law relating to old line legal reserve insurance companies. At this time interviews between plaintiff and one Wolcott, vice-president and general manager of defendant, had resulted in plaintiff's employment by the defendant to solicit persons, whose names were furnished by the defendant, to purchase stock in the defendant company, the inference being that this stock was to be sold in order to comply with the law in relation to old line insurance companies. This agreement was entered into during the early part of May, 1924. Under it plaintiff was required to interview persons whose names were furnished and to bring them if possible to the office of defendant where its officers would conclude the contract of purchase with the customer. For this service plaintiff was to receive ten per cent of the amount received for the stock in case a sale thereof was made. The stock was to be and was sold for $50 per share. Plaintiff interviewed various persons to whom the stock was sold by defendant. In the petition it is alleged that the amount of stock sold to plaintiff's customers was $3831.20. There were eight of these purchasers in all, some of whom were first interviewed before August 25, 1924, when defendant received a charter from the State changing it from a stipulated premium insurance company to an old line legal reserve insurance company, and some thereafter. The contracts with all of plaintiff's customers were consummated after the change of the company except with one Gordon. Plaintiff's commission on the sale to Gordon amounted to $100.

About the middle of September, 1924, plaintiff was told by Wolcott that the defendant would pay a commission of only five per cent on sales of stock. Plaintiff admitted defendant's right to reduce the commission on sales thereafter to be made but refused to recognize its right to pay less than ten per cent on sales to persons who had been solicited by him under and in accordance with his contract with defendant, whether the sales were consummated before or after the day of his conversation with Wolcott. After the middle of September, 1924, plaintiff solicited no new customers but continued to work

on his old customers and he finally discontinued his connection with defendant about the first of November, 1924. At least two of plaintiff's customers did not consummate their contracts for the purchase of their stock until after plaintiff had severed his connection with defendant. Plaintiff received from defendant advancements or payments from time to time, totaling the sum of $600 and, apparently, the jury allowed defendant this sum in arriving at its verdict.

It is claimed by defendant in support of its contention that its demurrer to the evidence should have been sustained, that after defendant became an old line legal reserve insurance company it had no more stock for sale and therefore could not have been liable in this case in any amount in view of the fact that plaintiff has received more than his commission on stock sold before the amendment of defendant's charter. In this connection it is claimed that the record conclusively shows that the capital stock had been fully subscribed at the time the amendment of the charter was issued by the State, and the defendant had no stock to sell after that time; that plaintiff admitted that he knew of the amendment of the charter and the legal consequences thereof; that plaintiff must have been selling stock of individuals instead of that of the company.

We think that the evidence is overwhelming to the effect that all of the stock sold that is in controversy in this suit, was that of the defendant. The evidence shows that one McPherson, president of the defendant, furnished $200,000 worth of "securities," apparently property of his own, in order to make it appear that the stock had been subscribed and paid for whereas it was not subscribed, at least, not wholly so. We infer that the names of various individuals were used as subscribers in applying for the new charter as, according to the articles of incorporation, the entire stock had been subscribed by these parties, forty-five in all. The amount of the capital stock was $200,000, divided in eight thousand shares of the par value of $25 each. Just what per cent of the capital stock had been bonafide subscribed at the time the new articles were filed, is not disclosed in the testimony. Whether the defendant intended to pay McPherson in cash from time to time for the securities put up by him or to return the securities so lent to it as rapidly as the company built up its assets from stock sales, does not clearly appear from the evidence, but it does appear that plaintiff at all times was selling defendant's stock and not that of McPherson or any other individual. This is shown, in part, by the fact that where notes were taken in payment of the stock, they were made in the name of the executive committee of the defendant who had been given authority by it to manage and conduct its business; all of the money received from sales on stock involved in this suit was deposited in defendant's bank account and used by it in conducting its business; the stubs in the stock book contained a form showing whether the stock issued had

been previously issued to some other person and as to the issuance of the stock in controversy the spaces on the stubs were left blank. The inference we gather from the stubs of the stock book is that the issuance of the stock to plaintiff's customers was original stock. There is no showing that the stock was ever issued to McPherson or any other individual and thereafter transferred or reissued to plaintiff's customers.

Defendant insists that before August 25, 1925, the time of the amendment of its charter, all of its stock in the "reorganized" company had been subscribed, as shown by the articles of incorporation, and it was "either a going legal reserve company with its stock all gone or an aggregation departed from legal *status* as a stipulated premium company and not yet 'arrived' as a legal reserve company." "There is no one to whom he could look for a contract binding upon this defendant because this defendant had not yet come into being." We think there is no merit in this contention. There never was any change, really, in the corporate existence of the defendant, there was merely a change in the character of insurance that it could write. Section 6186, Revised Statutes 1919, provides for the *amendment* of the articles of incorportion of an insurance company existing or doing business under the stipulated premium plan law by a majority of its board of directors accepting the provisions of the insurance law in reference to incorporation of old line legal reserve companies; that when this is done, it shall be the latter kind of a corporation "the same as if it had been originally incorporated thereunder;" that it "shall submit a record of the proceedings of its board of trustees, together with the *amended,* articles" to the Attorney-General for his approval as to "the legal form thereof;" that such companies should enjoy and exercise all the rights and privileges according to law "to companies originally incorporated" under the law in reference to old line legal reserve companies, and that—

"Compliance with this section shall in nowise annul, modify or change any of the existing contracts or obligations of the corporation, and any and all such contracts and liabilities shall continue in force and effect the same as if such corporation had not reincorporated under the provisions of this section; compliance with the provisions of this section shall in no way prejudice, impede or impair any pending action, proceeding or rights previously acquired."

It is apparent that the amendment of the charter of defendant under the provisions of section 6186, Revised Statutes 1919, did not create a new corporation. It is well settled that—

"The mere amendment of a charter or articles of incorporation does not create a new corporation or otherwise affect the identity of the corporation, or its existing rights of action, property rights, or liabilities; and this is true even where the amendment is made by the substitution of a new charter, if the manifest intention is to amend

merely and not to create a new corporation." [14 C. J. 197.] [See, also, 14 C. J. 194, 195, 196, 197; Grand River College v. Robertson, 67 Mo. App. 329.] There is no question but that defendant had a right before the change in its charter to contract with plaintiff to pay him a commission upon sales of stock, looking toward the procurement of enough subscribers to comply with the law in reference to the organization of insurance companies under the old line legal reserve plan, unless there was something otherwise unlawful in connection with such a contract not suggested by the defendant. Even though the change in the charter of defendant should be construed as creating a new corporation, defendant with full knowledge of the facts, accepted and retained the benefit of plaintiff's services by selling stock to his customers and taking and using the money paid for such stock in its business and thus ratified and adopted the acts of its officers and incorporators in employing plaintiff and is liable under the contract with him. Royal Casualty Co. v. Puller, 194 Mo. App. 588; Taylor v. Ins. Co., 266 Mo. 283, and Reynolds v. Title Guaranty Trust Co., 196 Mo. App. 21, cited by defendant, are not in point. Defendant continued to allow plaintiff to have a desk in its office and to conduct his business with it as he had done before. The statute, section 6186, makes it liable upon the contract with him, made before the amendment of its charter.

We think there is no question but that defendant is liable to plaintiff for his commission on sales of stock sold after the change in the charter, unless the mere fact that the law, section 6126, Revised Statutes 1919, providing that defendant should have the full amount of its capital stock in good faith subscribed at the time of the amendment of its charter, should be construed as depriving defendant of having any stock to sell after its charter was amended.

There is no question but that defendant violated the law when it amended its charter and as a matter of fact it should not have had any stock for sale at that time but that is a matter between it and the State of Missouri. [Home Stock Ins. Co. v. Sherwood, 72 Mo. 461, 464; Sedalia, etc., Ry. Co. v. Abell, 17 Mo. App. 645, 655, 656; Commerce Trust Co. v. Hettinger, 181 Mo. App. 338, 343; Schierenberg v. Stephens, 32 Mo. App. 314, 324, 325.] As before stated, while defendant should not have had any stock for sale after the amendment of its charter, it in fact did have and it having continued to accept plaintiff's services under its contract with him, if necessary a new contract will be implied between plaintiff and defendant coming into existence after the amendment of its charter and in terms the same as its original contract with him.

Defendant says that its amended charter, reciting that the stock was fully subscribed, together with the law requiring that it should be fully subscribed before it could commence or continue to do business, conclusively shows that it had no stock for sale after August

25, 1925, and that plaintiff is attacking the so-called reincorporation of defendant when he says that these circumstances do not show as a matter of law that all the stock was duly subscribed and paid for. We do not think that plaintiff is attempting to attack the legality of defendant's existence as a corporation under its so-called reincorporation when he attempts to recover from defendant. Plaintiff is not required to attack the legality of defendant's "reincorporation" in order to recover in this case. The statute does not declare a stock subscription void if not taken before the amended charter is issued, and in selling stock after that time it was not doing an essentially unlawful act, violating a public duty, or contravening any rule of public policy. [See 14a C. J., p. 309.] If it were, then it could not have recovered from a subscriber secured after that time upon his unpaid subscription, if any, who with knowledge of the facts participated in the affairs of the company. But there is no doubt that such a recovery could have been made. [Home Stock Ins. Co. v. Sherwood, supra; Sedalia, etc., Ry. Co. v. Abell, supra; Trust Co. v. Hettinger, supra.] In the case of Wilson v. Torchon Lace & Mercantile Co., 167 Mo. App. 305, cited by defendant, the whole court did not concur, but, in any event, it is not in point. The evidence in the case at bar shows that the sales to plaintiff's customers have been consummated, the stock delivered and the full consideration therefor received by defendant. So neither defendant nor said stockholders can question the transaction. [Schierenberg v. Stephens, supra; see, also, 14a C. J. 293.] If defendant has received the benefit of a contract of sales of stock that cannot be questioned, then it ought to pay plaintiff his commission.

It is claimed that plaintiff cannot recover commissions consummated after he severed his connection with defendant but his contract did not require him to consummate a sale.

From what we have said there is nothing in the contention of defendant in reference to the claimed error in the giving of plaintiff's instruction No. 1 and the refusal of defendant's instructions Nos. 4, 6, 7 and 9.

The judgment is affirmed. *Arnold, J.,* concurs; *Trimble, P. J.,* absent.