DANIEL HEGARTY,

*vs.*

AMERICAN COMMONWEALTHS POWER CORPORATION, a corporation created by and existing under the laws of the State of Delaware.

*New Castle, July 5, 1934.*

*Aaron Finger,* of the firm of Richards, Layton & Finger, and *Selig J. Levitan,* of New York City, for claimant.

*Clarence A. Southerland,* of the firm of Ward & Gray, for receivers.

THE CHANCELLOR: The claimant was the secretary of the insolvent corporation. In 1928 or 1929 the corporation

inaugurated a plan whereby it sought to stimulate the co-operation and loyalty of the employees of itself and its subsidiaries by having them become stockholders. The plan provided for the subscription to stock by employees approved by a committee. Payment of the subscription might be made either in full or under a deferred payment plan.

On July 31, 1929, the claimant subscribed for one thousand shares of the corporation's Class B common stock at twenty dollars per share, under the deferred payment plan. His subscription was evidenced by a written contract. He paid four thousand dollars in cash upon signing the contract and by its terms he was to pay the balance in designated installments. When receivers were appointed for the corporation on December 31, 1931, the claimant had paid seventeen thousand, six hundred dollars under his subscription agreement. The subscription contract contained two clauses which are of interest in the pending controversy. They are as follows:

"Tenth: * * * In the event that a subscriber who is paying for stock on the Deferred Payment Plan voluntarily leaves such employ, he shall be entitled to receive from the Corporation the amount of all payments theretofore made by him under his subscription agreement plus interest at the rate of 6% per annum from the respective dates of payment.

"Eleventh: * * * In the event that a subscriber, who is paying for his stock on the Deferred Payment Plan, is discharged from the employ of American Commonwealths Power Corporation or one of its subsidiary companies, within the period of twenty-months from the date of this subscription agreement, he may at his election receive either as many full shares as the amount paid under the subscription agreement will purchase at the subscription price or receive the full amount of payments made hereunder together with interest at the rate of 6% per annum from the respective dates of payment."

After the receivers were appointed on December 31, 1931, the claimant continued in his employment until about March 1, 1932, when, on the request of the receivers, he submitted his resignation. So far as he was concerned, he testifies, the termination of his employment was involuntary.

The claimant's claim is for an amount sufficient to cover the total of the payments made by him together with six per cent. interest thereon from the date of the respective payments down to the date of the appointment of receivers.

Assuming the repayment provisions of the contract to be valid, it nevertheless appears to be very doubtful that under the terms of the contract itself the claimant is entitled to assert his claim. His case must fall under either the tenth or the eleventh paragraphs of the contract quoted above. As he did not voluntarily leave his employment, how can he be said to come under the provisions in paragraph tenth? As he was not discharged within the period of twenty months from the date of his subscription, how can he be said to come under the provisions of the eleventh paragraph?

These questions were apparently neither raised nor discussed before the master. Neither have they been raised before me. I make no answer to them.

The receivers excepted to the claim on the general ground that the claimant is not a creditor and on the particular ground that by signing the subscription agreement the claimant assumed the status of a stockholder and that the provisions of the agreement respecting the repayment of the moneys paid thereunder are void.

Before the master, the particular ground just stated was relied on by the receivers, was the only one therefore passed upon by the master and is the only one presented before me by the exception to the master's report.

The claimant is confronted by the decisions of this court in *Pasotti v. U. S. Guardian Corp.*, 18 *Del. Ch.* 1, 156 *A.* 255, and *In re International Radiator Co.*, 10 *Del. Ch.* 358, 92 *A.* 255, which, unless his case is distinguishable, are controlling against him. He seeks to distinguish his case on the grounds now to be stated.

1. Certificates of stock calling for shares in sufficient number to cover all subscriptions received were issued in the name of H. M. Pleune, Agent. As the subscriptions

were paid, fully paid stock was issued to the respective subscribers out of the blocks held by Pleune.

It is objected that there never was any specific authority from the directors for the issuance of the stock to Pleune. If it be so, the fact is immaterial, since on January 15, 1929, the directors, by resolution duly adopted, appointed a committee with authority to offer stock for sale to employees and officers at the price of fifteen dollars per share for Class "A" common stock and twenty dollars per share for Class "B" common, upon such terms and conditions as the committee should deem advisable and proper, and limiting the number of shares of each kind to be offered under the resolution to twenty-five thousand. That resolution authorized the asking of subscription contracts. It committed the corporation as a party to all subscription contracts which were taken, including the claimant's. As a matter of convenient mechanics it appears that stock was issued to Pleune as agent without specific authority from the board in a total amount sufficient to make available for immediate transfer out of the agent's holdings all stock subscribed for when and as any portion thereof was fully paid. Until payment in full, no subscriber received stock from the agent. Granting, without determining, irregularity in the mechanics adopted for the anticipatory availability of stock certificates for subscribers who became fully paid, how can that fact invalidate the stockholder's subscription agreement? Can it be doubted that if the claimant had fully paid for his stock he would have been entitled to a certificate for one thousand shares? Certainly not, regardless of the regularity of the mechanics employed by the corporation to get them into his name.

2. It is said next that the issuance of stock in the name of Pleune was not reflected on the balance sheet. It should not have been until it was paid for by the subscribers. Under capital liability, however, the total of amounts paid on account of stock subscribed for was properly shown as a liability.

The complainant argues that as creditors' rights lie underneath the rule that generally speaking capital cannot be refunded to stockholders and subscribers, no creditor in this case would as a matter of equity be injured by allowing the claimant to turn himself from the status of stockholder to creditor, because a creditor examining the balance sheet would not have been led to believe that the stock outstanding embraced the shares subscribed for by him or by others for whom the stock was issued to Pleune, agent, for future delivery when paid for. Therefore, the claimant argues, no creditor being in a position to complain at deception from the balance sheet because of the claimant's subscription, the claimant ought to be permitted to alter his status from stockholder to creditor. To this it is proper first to reply, that the rule laid down in the Delaware cases referred to and which prevails generally in all the American jurisdictions, is not dependent for its operation on what creditors are led to believe from the appearance of a balance sheet showing capital stock liabilities. And in the next place, if it were otherwise, any creditor would have been advised by this corporation's balance sheet that there were unpaid stock subscriptions outstanding in some undisclosed amount.

3. It is further said that this case has a distinguishing feature which takes it out of the operation of the general rule, in this, viz., that the subscription agreement was made between the corporation and an employee, and that when an employee is a subscriber in response to an offer made by a corporation to all its employees in the interest of a plan to enlist their interests as investors, the employee is under a sort of compulsion born of a desire not to offend his employer. Where that is so, say the solicitors for the claimant, the subscriber-employee ought to be regarded as in a separate category from subscribers generally.

If the subscription contract is a valid one, which is not denied, I am unable to see how the reason or the motive for the subscriber's entering into it can have any effect upon

determining the consequences which the law regards as flowing from it.

4. Under this head, the solicitors for the claimant argue that as the stock was never delivered, the subscriber was not a stockholder, and not being a stockholder repayment to him can constitute no offense against the rule which forbids the conversion by stockholders of their stock investments into debts owed by the corporation. Of course the claimant did not receive the stock. He had not paid for it. He had subscribed for it. He was, however, so far as the present controversy is concerned, in the status of a stockholder; and the clause of his contract which undertook to allow him to be transformed into a creditor is in no better pass than would be a similar clause in a contract with a fully paid stockholder of record. There can be no doubt upon that proposition.

5. It is said that when the subscription was taken, the corporation was not in need of capital funds. Let it be so, how does the fact of the corporation's needs bear on the contract of subscription, the extent of its validity, or its legal incidences?

6. I do not understand the significance of the point raised under this head. The point is that the master did not specifically find that the moneys paid by the claimant were carried as a liability. The parties filed a stipulation before the master that the amount was so carried. If the master had specifically found as a fact what the parties stipulated with regard to the matter, the claimant would be in no better or worse situation. It is not worth while, if technically proper, to send the claim back to the master for a specific finding on a fact that the parties stipulated upon. The fact is before me and I have already adverted to it under 2, *supra*. It can be of no assistance to the claimant.

7. It is said that as it is a wise corporate policy to have employees enrolled among stockholders of an enterprise, and as employees will not be encouraged to enter

into subscription contracts unless they are given a special status in the event of the termination of employment distinct from that of non-employee subscribers, the general rule applicable to subscribers generally ought not to apply to them. In the same part of the brief where this argument is made, it is somewhat destroyed by the statement that employees are forced for fear of the employer's displeasure to enter into subscription contracts. If they are, there is hardly room to talk of encouraging their entering into the contracts by exceptional rules in their favor. Where the compulsion of fear exists, why talk of encouragement to act? Encouragement implies freedom of choice by the actor.

I can find no merit in the argument under this head. A contract of subscription for stock carries certain definite implications. Generally speaking those implications are not variable. There may be and, I think, are particular circumstances which constitute special cases. But the circumstance that a subscriber is employed by the subscribee is not such a particular circumstance.

If the solicitors for the claimant mean by the discussion under this head to argue that as a matter of public policy courts ought to adjust accepted contractual obligations so as to forward what would be wise business policies for corporations to pursue, I cannot accept the argument.

The foregoing, I believe, answers all the contentions raised on the brief of the claimant.

The exceptions to the master's report will be overruled, the report confirmed, and the claim disallowed.