W. T. GRANT COMPANY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1813–68. Filed May 15, 1972.

---

*A. Chauncey Newlin*, *David Sachs*, and *Michael H. Testa*, for the petitioner.

*Powell W. Holly, Jr.*, for the respondent.

SIMPSON, *Judge:* The respondent determined deficiencies in the petitioner's income tax for the taxable years ended January 31, 1964 and 1965, in the respective amounts of $4,594,199 and $5,376,267. Since the respondent has conceded one issue raised in the pleadings, the remaining issues for decision are: (1) Whether the petitioner's sales under its "Coupon Book Installment Plan" qualify for installment method treatment under section 453 of the Internal Revenue Code of 1954,[1] and (2) whether the petitioner is entitled to deduct certain amounts credited to the accounts of its employees under its employees stock purchase plans.

### FINDINGS OF FACT

Most of the facts have been stipulated, and those facts are so found.

The petitioner, W. T. Grant Co., is a corporation, incorporated in 1937 under the laws of the State of Delaware, which had its principal office and place of business in New York, N.Y., at the time of filing its petition in this case. It duly filed its Federal income tax returns for its taxable years ended January 31, 1964, and January 31, 1965, with the district director of internal revenue, New York, N.Y. A taxable or fiscal year of the petitioner will be identified by the calendar year in which it ends.

The petitioner is engaged in the business of selling a wide variety of merchandise at retail through more than 1,000 stores located throughout the United States. For many years, the petitioner, in addition to cash sales, has made sales of merchandise under three credit plans. These credit plans are designated by the petitioner as "30-day Option Plan," which is a revolving credit plan as defined in section 1.453–2(d) of the Income Tax Regulations; "Special Pur-

---

[1] All statutory references are to the Internal Revenue Code of 1954, unless otherwise indicated.

chase Installment Plan," which is a traditional installment plan as defined in section 1.453–2 of the regulations; and "Coupon Book Installment Plan." The Federal income tax treatment of the income derived under the first two of such plans is not in controversy, and it is agreed that the petitioner is a "dealer in personal property" as such term is defined in the Income Tax Regulations, sec. 1.453–1(a)(1).

Although the tax treatment of the special purchase installment plan is not in controversy, an explanation of the plan is helpful. Under the special purchase installment plan, a customer purchases one or more articles of merchandise and agrees in a retail credit agreement to pay for the merchandise in equal monthly installments over a certain period of time. During 1964 and 1965, such period of time varied from a minimum of 9 months under some contracts to a maximum of 25 months under others. At the time of the sale, a service charge, which is called a time-price differential, is determined and included as part of the sales price in the agreement. The amount of the monthly payments is determined according to a terms table, and the payments may vary from $5 to $24 on sales from $35 to $500, respectively. Under this plan, the petitioner does not bill its customers. Rather, when he executes the credit agreement, the customer receives an installment payment card which he mails or presents monthly to the petitioner together with the appropriate monthly payment, and upon which the petitioner records the receipt of the monthly payment for the customer's records. Under this plan, the petitioner retains title to the merchandise until full payment is made.

Under the petitioner's coupon book installment plan, a customer who has established a satisfactory credit rating is issued a book of coupons, and these coupons are redeemable for merchandise. Such coupons are issued in books containing coupons in the total amounts of $10, $15, $20, $25, $35, $50, and $100. Each coupon book is numbered. At the time the coupon book is issued to the customer, the customer agrees in a retail credit agreement to make payments in equal monthly installments over a fixed period of time. The fixed periods vary between a minimum and a maximum number of months. Over the years, the limits have varied between a minimum of 4 months and a maximum of 25 months, commencing with the time of issuance of the coupon book. During 1964 and 1965, the minimum period was 4 months and the maximum period was 18 months. At the time of issuance of the coupon book to the customer and execution of the agreement, the time-price differential is determined as of such date and included as a part of the selling price in the agreement. In completing the agreement upon issuance of coupons under this plan, the words "coupon book," together with the serial number of the particular coupon book issued, are entered in the space provided for the descrip-

tion of the merchandise sold. The terms table used by the petitioner provides for monthly payments ranging between $5 and $10.

The petitioner does not bill its customers under the coupon book installment plan. Rather, the customer receives an installment payment card, identical to that used with respect to the special purchase installment plan, which he mails or presents monthly, together with the appropriate monthly payment to the petitioner, and upon which the petitioner records the receipt of the monthly payment for the customer's records. Coupons may be exchanged by the customer for merchandise at any of the petitioner's stores throughout the country, regardless of where such coupons are issued.

The retail credit agreements used under the coupon book installment plan are identical in most States to those utilized under the special purchase installment plan and provide that the petitioner retains title to the merchandise sold thereunder until full payment is made. In New York, California, Delaware, and Oregon, State law does not permit title retention where merchandise is sold in exchange for coupons, and the form of retail credit agreement used in such States omits such a provision. Under both plans, the customer may pay installments in advance if he so desires, but such anticipation of the payments does not reduce the amount to be paid on each monthly payment due after the due dates of the prepaid payments; the customer may prepay the full balance due under the retail credit agreement, in that event, he receives a proportional refund credit of part of the time-price differential as required by applicable State law; a customer may return merchandise or unused coupons, in that event, the amount due under the retail credit agreement and the time-price differential will be appropriately reduced; and a customer may enter into a new retail credit agreement before the final installment under a prior agreement is due, in that event, the new agreement will incorporate the prior balance due and will include a new time-price differential determined at the time of signing the new agreement with reference to the new principal amount thereunder.

The petitioner records its sales under both the special purchase installment plan and the coupon book installment plan on the same forms and does not distinguish between the two plans for bookkeeping and accounting purposes. It maintains a ledger history card for each credit customer and posts sales of merchandise or issuance of coupons to such customer on such card. The same chapter in the petitioner's credit manual describes the petitioner's office procedures in handling sales under both plans.

Since each coupon book is numbered, it is identifiable to a particular installment contract. However, due to the enormous volume of coupons exchanged for merchandise, the petitioner does not identify and record the exchange of each coupon by account. Each store prepares

a report for each business day for monthly submission to the petitioner's central accounting department showing the aggregate dollar value information relative to coupons issued and finance charges, coupons exchanged for merchandise, and payments received on installment contracts. The petitioner's central accounting department then accounts for all such transactions as follows:

*Accounting for coupons issued*

| (Debit) | Accounts receivable | (Balance sheet) |
| (Credit) | Unredeemed credit coupons | (Balance sheet) |
| (Credit) | Finance charge income | (Profit and loss) |

*Accounting for coupons exchanged for merchandise*

| (Debit) | Unredeemed credit coupons | (Balance sheet) |
| (Credit) | Sales | (Profit and loss) |

*Accounting for payments received on installment contracts*

| (Debit) | Cash | (Balance sheet) |
| (Credit) | Accounts receivable | (Balance sheet) |

*Accounting for cost of merchandise*

Petitioner's accounting department records the cost of merchandise for which coupons are exchanged as follows:

| (Debit) | Cost of goods sold | (Profit and loss) |
| (Credit) | Inventory | (Balance sheet) |

In computing its gross profit for Federal income tax purposes, the petitioner reduces the gross profit on its books by what it refers to as "unrealized gross profit" for the year. Unrealized gross profit for the year is computed by (1) subtracting from the amount in the accounts receivable at the end of the year, the amount of unredeemed coupons at that same time and multiplying the figure so obtained by the applicable gross profit margin; and (2) subtracting from the resulting figure in (1) the figure arrived at by multiplying the accounts receivable as of the beginning of the year, less the unredeemed coupons at that time, by the applicable gross profit margin.

In the years 1964 and 1965, the coupons were issued and redeemed as follows:

|  | Year ending 1/31/64 | | Year ending 1/31/65 | |
| --- | --- | --- | --- | --- |
|  | Issued | Exchanged | Issued | Exchanged |
| February | $1,460,871 | $1,504,519 | $1,952,444 | $2,035,461 |
| March | 2,626,412 | 2,418,166 | 4,135,066 | 4,028,201 |
| April | 3,751,915 | 3,848,494 | 2,925,694 | 2,965,132 |
| May | 3,434,443 | 3,292,301 | 3,666,574 | 3,663,209 |
| June | 3,715,722 | 3,685,273 | 3,570,298 | 3,556,715 |
| July | 2,867,400 | 2,867,848 | 2,997,056 | 2,925,674 |
| August | 5,443,084 | 5,014,733 | 6,142,581 | 5,471,999 |
| September | 3,473,033 | 3,658,764 | 4,663,402 | 4,743,474 |
| October | 3,723,560 | 3,494,843 | 5,354,656 | 4,687,125 |
| November | 8,973,515 | 7,017,936 | 12,001,386 | 9,002,065 |
| December | 15,271,699 | 17,118,059 | 18,275,381 | 20,954,723 |
| January | 1,224,398 | 1,743,482 | 1,386,167 | 2,206,531 |
|  | 55,966,052 | 55,664,418 | 67,070,705 | 66,240,309 |

The balance in the unredeemed coupon account at the end of 1964 was $1,033,971, and at the end of 1965, was $1,864,367. Thus, the amounts of coupons exchanged for merchandise in those years equaled 99.46 percent and 98.76 percent, respectively, of the amounts of coupons issued during such years.

Under date of July 1, 1969, the petitioner received a letter from an attorney in the Division of Supervision and Regulation of the Board of Governors of the Federal Reserve System, Washington, D.C., in which it was stated that the coupon plan was not an open end credit plan.

In its Federal income tax returns for all years since the adoption of the coupon book installment plan in 1947, the petitioner has elected to report its gross profit on sales thereunder by using the installment method pursuant to section 453(a) and its predecessor, section 44(a) of the Internal Revenue Code of 1939.

In the notice of deficiency, the respondent determined that the sales made under the coupon book installment plan do not qualify for installment treatment "as traditional installment sales under the provisions of section 453(a) * * * and the regulations thereunder."

Throughout 1964 and 1965, the petitioner maintained an "Employees Stock Purchase Plan," which had been adopted in 1960 (the 1960 plan), and which had succeeded a plan that had been in effect since 1950 (the 1950 plan). In all relevant aspects, the two plans are alike, and both are involved in the petitioner's taxable years 1964 and 1965, since stock purchase contracts under each plan were outstanding in those years. The purpose of the 1950 plan was:

to provide an additional inducement for officers and employees to promote the best interests of the Company and its stockholders. This purpose is sought to be accomplished by affording an opportunity to certain officers and employees of the Company (herein referred to as "employees"), who are in a position to contribute materially to its prosperity, to purchase shares of its Common Stock on a deferred payment basis, and thereby to acquire a proprietary interest in the Company. For this purpose, and without in any way affecting the amount of their compensation or the terms of their employment, the employees designated are granted the privilege of purchasing shares of the Company's Common Stock under the terms and conditions set forth in the Plan.

The purpose set forth in the 1960 plan was not materially different. During the years 1964 and 1965, over 2,000 employees were offered stock, and over 300,000 shares were under contract.

The plans were administered by a committee which was composed of nonparticipating members of the petitioner's board of directors and which adopted the administrative regulations governing the operations of the plans. The regulations and committee action identified employees entitled to participate and the amounts of stock they were

entitled to purchase. In no event could an employee purchase stock in an amount and on such terms that the then unpaid balance of the purchase price owed by him with respect to all stock purchased under the plan exceeded the highest compensation paid or payable to him for any fiscal year.

Although the stock offered to employees could be either unissued stock or treasury stock, no treasury stock was available for this purpose throughout the petitioner's taxable years 1964 and 1965, and all offers of unissued stock were made pursuant to a prospectus. The stock, which had a par value of $2.50 per share, was offered to employees at a price fixed by a formula designed to arrive at a figure which was approximately its fair market value at the time that the employee accepted the offer, as shown by transactions on the New York Stock Exchange where such stock is listed.

An employee who received an offer was given 2 years (later reduced to 22 months and then to 11 months) to accept it, in whole or in part, at any time and from time to time. Upon electing to purchase, the employee executed a purchase contract and made a downpayment of $1 per share. He was expected to pay annually a minimum of 5 percent of the balance, and to pay the full balance within 10 years. If the employee failed to make his final payment on the purchase price, the petitioner was empowered to "issue and sell any undelivered shares which the employee was purchasing and apply the net proceeds against his account and pay over to him any surplus.

With respect to the stock not paid for in full, the plan provided that:

Cash dividends as such will not accrue * * *. However, on dividend payment dates a participating employee who is then actively employed by the Company will receive a credit in an amount equal to dividends paid by the Company with respect to the number of shares of stock purchased by the employee but not yet fully paid for and deliverable to him. Such dividend credit will be charged with interest on the unpaid balance of the purchase price at such annual rate as is prescribed by the Committee at the time the particular Purchase Contract is executed, which rate shall be not less than 2% per annum. The dividend credit, less interest charge, shall be applied against the purchase price * * *

Certificates for shares contracted for under the 1950 and 1960 plans were not issued to the purchaser at the time of the making of the contract, and were only issued in blocks of 10 shares, as such amount of stock was fully paid for. Until the stock was so issued, an employee had no voting rights with respect to such stock.

An employee's rights under the plan or under a purchase contract were not assignable, except that an employee could name a beneficiary who, in the event of the employee's death, would succeed to certain rights under a purchase contract. An employee could not sell shares purchased by him under the plan without first offering such shares to the company at their then market price.

If an employee ceased to be employed for any reason, he could not thereafter accept any pending offering of stock under the plans, and all dividend credits and interest charges ceased to accrue. In cases other than death, disability, or retirement, he could, within 30 days after termination of employment, pay the balance of the purchase price and obtain delivery of all shares then subject to a purchase contract. If he did not do so, the company, at its election, could cancel the contract, and if it did so, it was required to repay to the former employee the amount theretofore paid by him, including net dividend credits on the purchase price of shares not fully paid for and delivered to him. An employee was thereby assured of always receiving, in cash or in stock, an amount equal to the net dividend credits.

In the event of the death of a participating employee, his estate or his designated beneficiary, if any, succeeded to his rights (except that dividend credits ceased to accrue), and the balance due could be paid in 6 months. If the balance was not so paid, the company canceled the unpaid balance and returned all payments, including net dividend credits theretofore made on the purchase price of shares not fully paid for and delivered to the deceased employee.

If a participating employee retired or became disabled, thereafter he could not accept pending offers, and he was not entitled to further dividend credits. Under contracts dated before May 1, 1954, he was otherwise treated as continuing in the employ of the company for purposes of completing payments under existing stock purchase contracts, and under contracts dated thereafter, he was so treated for 2 years.

In the event of stock dividends or stock splitups with respect to the company's common stock, the number of shares then being offered to employees or which were then covered by outstanding purchase contracts was to be proportionately increased. If the petitioner offered subscription rights to its common stockholders, each participating employee had the right to subscribe for such securities as he would be entitled to subscribe for if he were then the record holder of the number of shares of common stock which were then the subject of outstanding purchase contracts entered into by him. At the employee's election, the securities which he would be entitled to subscribe for could be purchased by him under the same terms as existed in his most recent purchase contract. Employees did not have the right to sell or assign any such subscription rights.

Each plan provided that it could be terminated prior to the termination date stated therein by action of the board of directors of the petitioner, but such termination would not affect the right of employees to complete payment for stock which was then the subject of a purchase contract.

With respect to each participating employee, the petitioner, for each quarter, recorded on its books an amount equal to the quarterly dividend rate times the number of undelivered shares in the participating employee's account, less the applicable interest rate on the total unpaid balance. This "net dividend credit" was entered as a credit against the unpaid purchase price of stock subject to contract, and charged to profit and loss as an expense. For the petitioner's taxable years 1964 and 1965, the aggregate of credits equal to dividends were $519,817 and $544,194, and the aggregate of interest charges were $280,962 and $297,777, resulting in net dividend credits, respectively, of $238,855 and $246,417. The petitioner deducted such net dividend credits as "Salaries and Wages" in its Federal income tax returns for those years.

The petitioner did not withhold Federal income tax from employees participating in the employees stock purchase plan during the taxable years 1964 and 1965 with respect to the net dividend credits added to the accounts of participants during those years. However, the petitioner has filed, with respect to each participating employee, a Form W-2 reporting as compensation the net dividend credit added to the account of the participating employee. It has also sent to each participating employee a copy of W-2 and an annual letter advising him that for income tax purposes "this amount [the net dividend credit] must be reported by you as additional salary and not as dividends since dividends are not declared or paid on unissued shares of stock."

In an amendment to his answer, the respondent alleged that the net dividend credits were not deductible as compensation, but were in fact charges against surplus.

OPINION

The first issue to be decided is whether the petitioner's sales under its coupon book installment plan qualify for installment method treatment under section 453.

Section 453(a)(1) provides:

Under regulations prescribed by the Secretary or his delegate, a person who regularly sells or otherwise disposes of personal property on the installment plan may return as income therefrom in any taxable year that proportion of the installment payments actually received in that year which the gross profit, realized or to be realized when payment is completed, bears to the total contract price.

Section 1.453-2(b)(1), Income Tax Regs., in relevant part provides:

The term "sale on the installment plan" means—

(1) A sale of personal property by the taxpayer under any plan for the sale or other disposition of personal property, which plan, by its terms and conditions, contemplates that each sale under the plan will be paid for in two or more payments, * * *

The respondent contends that the coupon book installment plan does not meet the requirements of this regulation. It is his position that under the plan there are separate transactions entered into by the customer: In the first transaction, the customer purchases a coupon book agreeing to pay for it over a period of time. In separate transactions, he purchases merchandise in one of the petitioner's stores by exchanging coupons therefor, without the execution of any further agreement regarding the particular item of merchandise purchased. Thus, the respondent argues that the monthly payments made by the customer are not specifically attributable to the purchase of any item of merchandise, that one payment may represent the sum of prices paid for several items, and that therefore it cannot be concluded that each sale of merchandise through a redemption of coupons is paid for in two or more installments.

On the other hand, the petitioner contends that the coupon plan is an installment plan because it contemplates the purchase of an aggregate of items of merchandise, of a predetermined amount, which is to be paid for in two or more installments. It is, thus, the petitioner's position that the payments made by the customers are not for the coupons, which have no intrinsic worth, but are for the merchandise, and that the coupons merely allow the customer to get delivery of such merchandise. The petitioner argues that in substance the coupon book installment plan is merely an arrangement permitting customers to purchase a number of items of merchandise and to pay for them in installments, and that to the extent that installments are not paid during the taxable year, it is entitled to defer a portion of the profits on the sales until a later year under section 453.

An example of the petitioner's treatment of sales under the coupon book installment plan will be helpful in understanding the issues in this case: Assume that a customer purchased a coupon book, containing $100 worth of coupons, and executed a retail installment contract agreeing to pay $110 for the book in installments. During the year, the customer paid 4 installments, totaling $40, of the purchase price of the book and exchanged $80 worth of coupons. The petitioner's cost of goods sold and other expenses attributable to the sales were $54, and its gross profit ratio for the year was 40 percent.

At the time of the sale of the coupon book and the execution of the retail credit agreement, the petitioner would establish an account receivable of $110. The payments received during the year would be credited to that account so that at the end of the year it stood at $70. When the account receivable was established, the $10 finance charge would be includable in income, and as the coupons were redeemed, they would be recorded as income so that during the year, the petitioner would record $90 as income. At the end of the year, the peti-

tioner's books would show $36, or 40 percent of $90, as the profit from these transactions. To compute its gross unrealized profit for the year due to these transactions, the petitioner would subtract from the $70 in the account receivable at the end of the year, the amount of the unredeemed coupons, or $20. The balance, or $50, would be multiplied by the gross profit ratio of 40 percent, resulting in an unrealized gross profit due to these sales of $20. This amount is deferred under the petitioner's method of accounting, with the result that $16, or $36 less $20, remains in the petitioner's income for the year. The $16 represents 40 percent of the $40 in payments that were actually received during the year.

If the customer had redeemed only $40 worth of coupons during the year, then $50 would have been includable in the petitioner's income—$40 worth of sales and $10 finance charge, and it would exclude only $4 of unrealized gross profit—40 percent of the $10 finance charge which has not yet been collected by the petitioner. It would report as profit $16, or 40 percent of the $40 received during the year.

Since 1926, the tax laws have allowed dealers in personal property to elect to report their profits on installment sales by use of the installment method described in section 453(a). The Supreme Court stated in *Commissioner* v. *South Texas Co.*, 333 U.S. 496, 503 (1948):

> The installment basis of reporting was enacted, as shown by its history, to relieve taxpayers who adopted it from having to pay an income tax in the year of sale based on the full amount of anticipated profits when in fact they had *received in cash* only a small portion of the sales price. * * * [Emphasis supplied.]

See *Burnet* v. *S. & L. Bldg. Corp.*, 288 U.S. 406, 413 (1933); *Everett Pozzi*, 49 T.C. 119 (1967); *Thomas F. Prendergast, Executor*, 22 B.T.A. 1259, 1262 (1931). In construing section 453, it is our responsibility to attempt to carry out that purpose. See *Blum's, Incorporated*, 7 B.T.A. 737, 758 (1927).

Section 453 refers to "sales on the installment plan" without any special definition of the term, and therefore, we should construe it in the light of the generally accepted meaning of such term. *Consolidated Dry Goods Co.* v. *United States*, 180 F. Supp. 878 (D. Mass. 1960); see also *Bingham* v. *Commissioner*, 105 F. 2d 971 (C.A. 2, 1939). Finney & Miller, Principles of Accounting—Advanced 104 (5th ed. 1960), says "An installment sale is a sales arrangement whereby the selling price is collected in *periodical* installments." (Emphasis supplied.) Webster's New International Dictionary (3d ed. 1968) contains the following definition of "installment selling": "the selling of consumer goods on credit under conditional sales contracts that provide for regular periodic payments after an initial down payment."

Although the petitioner's credit manual recognizes the possibility that a coupon book may be paid for in cash, the parties have stipulated

that the purchase agreements executed in 1964 and 1965 provided for from 4 to 18 payments. Moreover, even if a coupon book is sold for cash, there is no debit to accounts receivable and consequently no deferral of income. Thus, any cash sales are clearly segregated, and we are only concerned with those sales that were paid for in installments.

Apparently, merchandise certificates, such as the coupons used by the petitioner, are widely used in making credit sales. The National Conference of Commissioners on Uniform State Laws said, in connection with the Uniform Consumer Credit Code (sec. 2.105):

"Merchandise certificate" primarily means the kind of scrip issued by merchants to facilitate the purchase on credit of a number of relatively small items so that a separate contract or agreement is not required for each item purchased * * *

A number of the State statutes regulating credit sales recognize that merchandise certificates are commonly used in connection with such sales. See, e.g., California Civil Code governing retail installment sales, sec. 1802.1; Delaware Retail Installment Sales Law (Del. Code Ann., tit. 6, sec. 4301 (1970 supp.); Kansas Sales Finance Act, ch. 16-502(a).

It is clear to us that when a customer of the petitioner purchases a coupon book, he is doing so in order to acquire an aggregate of merchandise and to pay for it in installments. By purchasing the book of coupons, the customer can obtain the desired merchandise at that time, or shortly thereafter, while paying for it in installments over a number of months, perhaps as many as 18. The coupons have no intrinsic value; there is no reason for the customer to purchase them, except as a step toward purchasing the merchandise on credit. If the customer merely wished to make several small purchases and pay for them at the time, there would be no need for him to purchase a coupon book and to incur the added finance charge. Moreover, the data concerning the issuance and redemption of coupons in 1964 and 1965 suggests that most of the coupons are redeemed shortly after they are issued. It would be utterly uneconomical for the petitioner to enter into a special installment sales contract with respect to each small sale of merchandise. The coupon book is a practicable method to permit customers to purchase an aggregate of small items of merchandise on credit. In our opinion, the sales under such plan come within the general concept of installment sales.

Furthermore, we think that the petitioner is entitled to treat sales under its coupon book installment plan as installment sales under section 453. The section was enacted so that the tax could be paid "from the proceeds collected rather than be advanced by the taxpayer." *Thomas F. Prendergast, Executor, supra* at 1262. When the petitioner

makes sales under such plan, part of the purchase price is not collected until a later year. If the petitioner cannot use the installment method for reporting the gain on such sales, it will be taxable on the entire gain in the year of sale, even though the purchase price is to be paid in installments, some of which will not be received until a later year; thus, the petitioner would, in effect, have to "advance the tax." As the example illustrates, the petitioner's method of treating sales under its coupon book installment plan results in the petitioner reporting the portion of the payments that it receives during the year and deferring the profit attributable to the installments to be received in a later year. Under the petitioner's method, no deferral is claimed except with respect to those sales which are paid for in installments, some of which are to be received in a later year; and an adjustment is made to exclude from consideration the unredeemed coupons representing sales not yet completed. The fact that the installment payments are not traced to particular sales of merchandise does not prevent the petitioner from achieving the proper accounting treatment of the sales under the coupon book installment plan. In addition, since a coupon book is an arrangement to purchase an aggregate of merchandise which is paid for in installments, the "two or more payment rule" of section 453 is also satisfied, regardless of when a particular item of merchandise is selected and the sale thereof is completed. Thus, we conclude and hold that the sales under such plan qualify for installment method treatment under section 453.

Our conclusion is quite consistent with the regulations under section 453. All sales under the coupon book installment plan, with which we are concerned, are paid for in installments, and consequently, they all meet the test set out in section 1.453–2(b) of the regulations. The technical objections raised by the respondent in this case are similar to those that he presented in *Consolidated Dry Goods Co.* v. *United States, supra.* There he argued that revolving credit sales should not qualify for installment method treatment because there is not a separate installment contract executed with respect to each sale, and because the payments cannot be identified or traced to a particular sale of merchandise. The court there rejected such arguments on the ground that the absence of such conditions did not prevent the revolving credit sales from qualifying as installment sales within the general meaning of that term.

After that decision, the Treasury regulations were amended to recognize that certain revolving credit sales could qualify as installment sales, despite the respondent's prior technical objections. Sec. 1.453–2 (d), Income Tax Regs. Similarly, in 1964, Congress also recognized that revolving credit sales could qualify under section 453. Thus, both

the Treasury and the Congress now recognize that revolving credit sales can qualify under section 453, even though there is no separate installment contract for each sale, and each payment is not traceable to a particular sale of merchandise. Likewise, the absence of such conditions does not prevent the petitioner's sales under its coupon book installment plan from qualifying under section 453.

The respondent seems to contend that the regulations relating to revolving credit plans narrowed the scope of *Consolidated Dry Goods Co.* v. *United States, supra;* that such narrowing was approved by Congress, and that therefore Congress did not intend that plans such as the coupon book installment plan qualify for section 453 treatment. However, under a revolving credit plan, a customer makes purchases during a billing period and has the option of paying for all or part of his purchases at the end of such period. If he pays for all his purchases at the end of the period, there is no finance charge; the goods have been paid for in one payment, and the purpose for applying section 453 is not present. However, if the customer elects to pay only a portion of his bill and defer payment of the remainder thereof, the purpose for applying section 453 is present. *Consolidated Dry Goods* held that an entire revolving credit plan qualified for installment reporting even though it was possible that not all the customers under the plan used the deferred-payment option. When the regulations were amended to provide for revolving credit plans, the deferral of income under such plans was limited to income arising out of sales involving more than one payment. The regulations provided a method for differentiating between such sales and sales involving just one payment. Sec. 1.453-2(d), Income Tax Regs. On February 26, 1964, Congress enacted section 453(e) which provided that:

(e) REVOLVING CREDIT TYPE PLANS.—For purposes of subsection (a), the term "installment plan" includes a revolving credit type plan which provides that the purchaser of personal property at retail may pay for such property in a series of periodic payments of an agreed portion of the amounts due the seller under the plan, except that such term does not include any such plan with respect to a purchaser who uses his account primarily as an ordinary charge account. [Act of Feb. 26, 1964, Pub. L. 88–272, 78 Stat. 19, 75.]

In August 1964, Congress repealed the provision that it had enacted in February, and Mr. Mills said:

It was concluded that because of the variation in revolving credit type plans, it was better to leave to regulation—which could provide the necessary flexibility—the extent to which sales under revolving credit type plans are to be treated as sales under installment plans. [110 Cong. Rec. 20302 (1964).]

See H. Rept. No. 1290, to accompany the Act of Aug. 31, 1964 (Pub. L. 88–539), 88th Cong., 2d Sess., p. 4–5; Act of Aug. 31, 1964, Pub. L. 88–539, 78 Stat. 746. It is apparent from this brief review of the treat-

ment of revolving credit plans that both Congress and the Treasury were basically concerned with differentiating between sales involving one payment and those involving more than one payment and that the holding of *Consolidated Dry Goods* has, except as to that point, been accepted by the Congress and the Treasury. Since we have found that the coupon book installment plan involves two or more payments, there is no indication that Congress intended to exclude this type of plan from the scope of section 453.

The second issue for decision is whether the net dividend credits under the petitioner's employee stock purchase plan constituted compensation which was deductible under section 162. As the respondent raised this issue by means of an amended answer, he has the burden of proof on the issue. Rule 32, Tax Court Rules of Practice; *Texas Pipe Line Co.*, 32 B.T.A. 125 (1935), affd. 87 F. 2d 662 (C.A. 3, 1937). The respondent contends that when an employee executed a purchase contract under one of the petitioner's plans, he became the beneficial owner of the shares contracted for and that the credits were, therefore, dividends. The respondent further contends that even if the credits were not dividends, they were a nondeductible distribution of surplus because the stock purchase plans were essentially designed, not to provide for compensation, but to provide certain employees with the opportunity to acquire a proprietary interest in the company. The petitioner contends that the stock being acquired under the plans did not constitute issued stock until it was paid for and delivered to the employees and that under Delaware law, the petitioner could not legally pay dividends on such unissued stock. The petitioner concludes that the net dividend credits cannot be considered to be dividends and that such credits constituted reasonable compensation paid by it to the participating employees.

In determining whether the employee became a stockholder at the time he signed the agreement, we must interpret the purchase contract in accordance with Delaware law. See *United States Steel Corporation*, 2 T.C. 430, 437 (1943) (where this Court held certain dividend credits which were paid under an employee stock purchase plan to be deductible compensation). After a careful consideration of Delaware law, we have concluded that the question of whether there has been a subscription to stock, which results in conferring the status of stockholder upon the subscriber as of the date of the subscription, is a question which depends upon the terms of the agreement and the intention of the parties. *Louisiana Oil Exploration Co.* v. *Raskob*, 32 Del. 564, 127 Atl. 713 (Super. Ct. 1925). It appears further that an agreement to purchase stock upon a deferred-payment plan conferred such a status upon a purchaser only where the contract did not set forth con-

ditions precedent to the assumption by the purchaser of such status. See *Hegarty* v. *American Commonwealths Power Corp.*, 20 Del. Ch. 231, 174 Atl. 273 (1934); *Pasotti* v. *United States Guardian Corporation*, 18 Del. Ch. 1, 156 Atl. 255 (1931).

Having examined the evidence before this Court regarding the terms of the agreements and the intentions of the parties to those agreements, we have concluded that the petitioner's employees did not become stockholders upon the execution of the stock purchase contracts. Rather, they became stockholders only when the shares were paid for and issued in blocks of 10, as provided for in the plans. We think it clear that this was the intention of the parties. The agreements specifically provided that shares should be delivered to employees only as paid for in full and only in blocks of 10. Prior to the delivery, the employees had no voting rights and no interests as stockholders which could be assigned. Furthermore, the net dividend credit applied only so long as an employee remained in the petitioner's employ. For instance, in the case of a retired employee, the net dividend credit was no longer accruable even though the retired employee continued to pay for stock on the deferred basis.

It follows, and we conclude, that since the employees became stockholders only when shares were issued to them in blocks of 10, the net dividend credits made to their accounts prior thereto did not constitute dividends. Rather, we think it clear from the plans and the agreements that it was the intention of the parties that the net dividend credits should constitute additional compensation. *Thurman* v. *Studebaker Corporation*, 88 F. 2d 984 (C.A. 7, 1937); *United States Steel Corporation, supra; Electric Storage Battery Co.*, 39 B.T.A. 121 (1939). The plans stated that the purpose was to provide an additional *inducement* for officers and employees to promote the best interests of the company and its stockholders (the 1960 plan used the word "incentive"). Furthermore, the net dividend credits were made only so long as an employee continued in the employ of the petitioner.

The respondent points to language contained in the plans to the effect that the employees designated are granted the privilege of purchasing the shares "without in any way affecting the amount of their compensation or the terms of their employment," and argues that this indicates that the intention was only to permit the purchase of stock, and not to provide compensation under the plans. We think, however, that the purpose of this language was to make certain that the purchase of the stock under the terms of the plans should not affect the regular compensation of the employees. We consider the net dividend credits as additional compensation. In this connection, it should be observed that the respondent does not contend that, if the net dividend credits are held to be additional compensation, the compensation paid

to the employees is unreasonable in amount within the meaning of section 162(a)(1). Nor does the respondent contend that, if the credits constitute additional compensation, they are not deductible in the years they are made and become nonforfeitable.

In view of the foregoing considerations, it is our conclusion that the petitioner properly deducted the net dividend credits as compensation in the years such credits were made.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

ATKINS, *J.*, dissenting: I respectivefully dissent from the holding of the majority that all sales under petitioner's coupon book installment plan quality for installment reporting treatment under section 453(a) of the Internal Revenue Code of 1954.

As pointed out by the majority, section 453(a) contains no specific definition of the term "sale on the installment plan." However, the regulations promulgated pursuant thereto do contain a detailed definition of what is meant by that term. Section 1.453-2(b) of the Income Tax Regulations provides as follows:

(b) *Definition of sale on the installment plan.* The term "sale on the installment plan" means—

(1) A sale of personal property by the taxpayer under any plan for the sale or other disposition of personal property which plan, by its terms and conditions, contemplates that each sale under the plan will be paid for in two or more payments, or

(2) A sale of personal property by the taxpayer under any plan for the sale or other disposition of personal property—

(i) Which plan, by its terms and conditions contemplates that such sale will be paid for in two or more payments, and

(ii) Which sale is in fact paid for in two or more payments.

Normally, a sale under a traditional installment plan (as described in paragraph (a)(1) of section 1.453-1), meets the requirements of subparagraph (1) of this paragraph. See paragraph (d) of this section for the application of the requirements of subparagraph (2) of this paragraph to sales under revolving credit plans.

The majority relies upon the case of *Consolidated Dry Goods Co.* v. *United States* (D. Mass. 1960), 180 F. Supp. 878, for the proposition that since the statute contains no definition of the term "sale on the installment plan" such term should be construed in the light of the generally accepted meaning of such term. In that case the court held that a revolving credit plan came within the ordinary meaning and accepted trade meaning of the term "installment plan," and that therefore sales under such plan qualified for installment reporting. However, as pointed out by the court, the statute and the then applicable regulations contained no express definition of the term "installment plan."

Thereafter, on October 15, 1963, the respondent promulgated new regulations containing the above-quoted provisions and provided for installment plan treatment of certain amounts received under revolving credit plans. See T.D. 6682, 1963–2 C.B. 197. However, the respondent in such regulations did not accept in its entirety the holding of the court in the *Consolidated Dry Goods* case. Revolving credit plans fall only within the second definition contained in the above regulations, and the regulations require that it be proved which sales are in fact paid for in two or more installments. A method was provided for determining what percentage of revolving credit accounts meets this requirement. The above regulations have been subjected to congressional scrutiny and the approach taken by the respondent has been approved by Congress.[1]

---

[1] By sec. 222 of the Revenue Act of 1964 (enacted Feb. 26, 1964), Congress amended sec. 453 of the Code by adding a subsection providing that the term "installment plan" includes a revolving credit plan. However, by Pub. L. 88–539 (enacted Aug. 31, 1964), Congress repealed such provision retroactively as of its initial effective date. With regard to such repeal, it was stated in S. Rept. No. 1242, 88th Cong., 2d Sess., 1964–2 C.B. 699 :

"*Revolving credit-type plans.*—Prior to October 15, 1963, sales under revolving credit type plans were not recognized by the Treasury Department as installment sales for tax purposes because of certain differences between revolving credit plans and traditional installment plans.

"Traditional installment plans (described in regulations sec. 1.453–2(b)(1)) ordinarily involve a separate contract for each item of property purchased, providing for a series of payments specifically applicable to the purchase price of that property. Usually the seller also retains some type of security interest in the property until the property is paid for. Revolving credit type plans (described in regulations sec. 1.453–2(b)(2)) on the other hand usually do not involve separate sales contracts. Under these plans, any item in the store may be charged to the same account and the seller does not retain any security interest in the property sold. The buyer frequently has the option to pay his account in full within 30 days with no finance charges or he may pay the account in installments with periodic finance charges related to the unpaid balances of the account. In this latter case, the buyer's regular payments are not specifically attributable to the purchase price of any single item but instead go to reduce the unpaid balance on what may be the total price of several items purchased at different times.

"New regulations were issued by the Treasury Department on October 15, 1963 (T.D. 6682) specifically providing for installment sale treatment of certain amounts received under revolving credit plans. Broadly speaking, under these rules, a sample of revolving credit sales is taken from balances in customer accounts as of the billing dates for the last month of the seller's taxable year and the percentage of sales in the sample accounts determined which : (1) are the type the revolving credit plan contemplates will be paid for in two or more installments and (2) actually are paid for in two or more installments. The percentage is then applied to the balance of the total revolving credit accounts (after adjusting for sales of nonpersonal property) and the resulting amount is treated as representing sales under the installment plan.

"In the Revenue Act of 1964, Congress in effect replaced these regulations with a provision providing that the term installment plan was to include a revolving credit type plan, except that the term was not to include any such plan with respect to a purchaser who uses it primarily as an ordinary charge account.

"Your committee has concluded that it would have been better to have left the Treasury Department with the opportunity to determine by regulation the extent to which sales under revolving credit type plans are to be treated as sales under installment plans. For that reason, it has repealed the provision added in this respect by the Revenue Act of 1964 (subsec. (e) of sec. 453 as added by sec. 222 of the Revenue Act of 1964). In taking this action, your committee intends that the term "sales on the installment plan" be interpreted by the regulations as covering "sales on a revolving credit type plan" to the full extent provided in the regulations issued by the Treasury Department on October 15, 1963 (T.D. 6682). However, it is anticipated that continuing efforts will be made to simplify the sampling procedures required by those regulations as experience makes this possible."

In view of the foregoing, it seems to me that the *Consolidated Dry Goods* case is of little help here. It also seems clear to me that, unless the above-quoted regulations are to be disregarded, resort to general definitions of the term "sale on the installment plan" is beside the point. Nor are the provisions of State law with regard to coupons and coupon sales helpful in deciding what is a "sale on the installment plan" for Federal income tax purposes. I, of course, recognize the relief purpose for enactment of the installment method of reporting income as pointed out by the majority, but it is still incumbent upon petitioner to show it qualifies for the relief under the statute and regulations.

It is clear that the plan here involved calls for the payment for coupons in installments. However, the petitioner does not contend, nor does the majority hold, that this is itself a sale of merchandise upon the installment plan within the meaning of section 453(a). Translating this into sales of merchandise under an installment plan is another matter and I cannot agree with the majority.

I agree that this plan generally is intended to facilitate the purchase of a number of relatively small items of merchandise with the customer paying therefor by the installments provided for the payment for the coupon book itself. And it is apparently the case that most customers redeem their coupons shortly after issuance so that the installments payable for the coupon book are in fact payable for the merchandise purchased. However, there is no showing that this is always so.

Under the petitioner's accounting system, and under the majority's holding, a sale does not take place until the customer exchanges coupons for merchandise. It is these sales all of which are held to be "sales on the installment plan." Such conclusion is not in accord with the applicable regulations.

As pointed out above, section 1.453–2(b) sets forth two definitions of the term "sale on the installment plan." The majority focuses only on the first definition and does not take into consideration the second definition. The language of the two definitions is inartful at best and at first reading it may appear that the two definitions are both referring to the same thing. But obviously they contemplate two different situations which are to be distinguished from each other.

The second definition refers to a sale under a plan which plan contemplates that such sale will be paid for in two or more payments and which sale is in fact paid for in two or more payments. As an example of this the regulations refer to sales under a revolving credit plan.[2] It seems to me that this definition requires two things: First,

---

[2] Although the reason for the adoption of the definitions contained in sec. 1.453–2(b) and of the other sections of the regulations promulgated in T.D. 6682 may have been to deal specifically with the problem of sales under revolving-credit-type plans, there is nothing which would indicate that the second definition in sec. 1.453–2(b) is limited to sales under such plans. Rather, I view the second definition as being applicable to sales under any plan not coming within the first definition.

an examination of a particular sale to see if that sale, under the terms of the plan under which it took place, may be paid for in two or more payments; and second, an after-the-fact determination as to whether or not that particular sale was in fact paid for in two or more payments. Distinguished from this is the first definition which states that a sale on the installment plan is a sale under a plan which plan contemplates that *each* sale under the plan will be paid for in two or more payments. As an example of this the regulations refer to a traditional installment sale. It will be noted that this definition does not at all look to what in fact happens. It looks solely to the plan itself. I think it is clear that this means that the plan must be such that by its terms and conditions there can be no sale thereunder which is to be paid for in less than two payments. If this is not so, the second definition, which looks to what in fact happens, would be meaningless.

Viewed in this light, I do not think that petitioner's coupon book installment plan is a plan under which there can be no sales paid for in less than two payments. As pointed out above, a sale under the plan does not take place until the customer redeems a coupon or coupons for merchandise. A customer might buy merchandise in an amount that has theretofore been completely paid for by the installments provided under the retail credit agreement; or a customer might buy merchandise in an amount for which there is only one remaining installment due; or a customer might buy merchandise each month only in an amount which is covered by the next installment due under the retail credit agreement. These illustrations establish that there can be sales under petitioner's plan which can be paid for in less than two payments. The fact that the examples cited may rarely take place in fact is irrelevant. We are concerned initially only with whether under the literal terms of the plan there can ever be sales which will be paid for in less than two payments. Accordingly, the sales under petitioner's plan fail to qualify under the first definition, namely, that contained in section 1.453–2(b) (1).

However, petitioner's coupon book installment plan does contemplate that there will be sales which can be paid for in two or more payments. Accordingly, any sale which is in fact paid for in two or more payments will qualify for installment reporting pursuant to the provisions of section 1.453–2(b) (2) of the regulations.

The concern is only with those sales as to which a portion of the profit is being deferred from one taxable year to another. The amount of profit deferred is the profit reflected in the accounts receivable outstanding as of the end of the year. Under petitioner's accounting

system when coupon books are sold the amount due thereon is included in accounts receivable. However, as payments are made on such coupon books the accounts receivable are appropriately reduced. Hence, any sales made by the exchange of coupons which have already been paid for do not enter into the problem here presented since accounts receivable have been reduced by such payments and the profit on such sales is included in taxable income for the year. As of the end of the year the amount of unredeemed coupons is deducted from the amount of accounts receivable, so that the accounts receivable as of that time, as so reduced, reflect only consummated sales the profit on which petitioner has deferred.

I think it is apparent that any sales made prior to the last month of petitioner's taxable year for which petitioner has deferred any profit were paid for in two or more installments, since the installments on the coupon books sales are paid monthly. In such cases there would have been a payment in the last month of the taxable year and at least one payment in the subsequent year. Accordingly, I would hold that the petitioner properly deferred the reporting of profit on such sales.

A different situation is presented with respect to sales made in the last month of each taxable year. It may be that all or substantially all such sales are paid for in two or more installments, but this the petitioner has not shown. Indeed, since petitioner does not identify and record the exchange of each coupon by reference to each coupon book account, it would not be possible to determine which of such sales were paid for in two or more installments. It is quite possible that some of such sales were not paid for in two or more installments. For example, during the last month of the year a customer may have purchased goods by using a coupon with respect to which there is but one remaining installment due, namely, the installment due to be paid after the end of the year. Or during the last month of the year a customer might purchase goods by use of a coupon with respect to which there is more than one installment due to be paid after the end of the year, but the customer elects to prepay such installments in one payment so that in fact there is but one payment after the purchase of the merchandise. In such cases, it could not be considered that the purchase price was paid in two or more installments, as contemplated by setcion 1.453–2(b)(2) of the regulations.

Under the circumstances I would hold that the reporting of profit on sales made under this plan in the last month of each of the petitioner's taxable years in question may not be deferred.

HOYT, *J.*, agrees with this dissent.